## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

| | |
|---|---|
| **STANFORD T. ALLEN, JR.,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )          **Civil Action No. 1:06-0597** |
| | ) |
| **THOMAS MCBRIDE, Warden,** | ) |
| | ) |
| **Respondent.** | ) |

### PROPOSED FINDINGS AND RECOMMENDATION

On August 1, 2006, Petitioner, an inmate at Mount Olive Correctional Complex, acting *pro se*, filed a Petition Under 28 U.S.C. §2254 for Writ of *Habeas Corpus* By A Person in State Custody.[1] (Document No. 1.) Petitioner alleges the following grounds for *habeas* relief:

     1.  The petitioner contends the trial court violated his United States Constitutional Rights and due process of law under the Fourteenth Amendment because the court committed reversible error in not granting a change of venue due to the extensive, negative and prejudicial pre-trial publicity, and the jury pool in the state trial was not impartial, and consequently his request for change of venue should have been granted. (Document No. 1-2.)

     2.  The petitioner contends his state and federal constitutional rights under both the West Virginia and United States Constitutions to equal protection, due process of law, a fair and impartial jury trial were violated due to ineffective assistance of counsel, violative of Article III, Sections 10, 14, and 17 of the West Virginia Constitution and the First, Sixth and Fourteenth Amendments to the United States Constitution.(Document No. 1-3.)

     3.  The petitioner contends he does have a constitutional right to discovery, and he has raised a meritorious claim because the failure of the State prosecutor, Sidney Bell, to provide his defense counsel and the trial court with exculpatory information which denied his right to fully and fairly defend himself against all the

---

[1] Because Petitioner is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer, and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

felony indictments in this case during the trial proceedings. Thus, he claims he is entitled to a new trial because the prosecutions introduction of evidence did not provide a full disclosure or discovery pursuant to Brady v. Maryland, 373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194 (1963.) (Document No.1-4.)

4. The petitioner contends the trial court committed reversible error when it did not suppress all post Miranda statements by the petitioner because the police used duress and coercive means to elicit said statements in violation to both his state and federal constitutional rights to remain silent, and his 5th and Sixth amendment right to counsel and his Fourteenth Amendment to the United States Constitution. (Document No. 1-5.)

5. Petitioner contends the trial court erred in not granting a direct verdict of acquittal, arrest of judgment, or a new trial due to there being sufficient evidence to support guilty verdicts of three (3) counts of first degree murder. Thus, he argues the verdicts in his case are contrary to the evidence and are without merit and it involves a question of state and federal law. Therefore, he has proven under Jackson v. Virginia, 443 U.S. 307, 319 (1979), a Jackson issue on the question of the sufficiency of the state's evidence and case in chief.(Document No. 1-6.)

6. The petitioner contends his constitutional rights to a full and fair trial and due process of law were violated under the United States and West Virginia Constitutions, due to prosecutorial misconduct committed by the State's prosecuting attorney, Sidney H. Bell. (Document No. 1-7.)

7. The petitioner contends the trial court committed numerous reversible and prejudicial errors violating all his state and federal constitutional rights to equal protection, due process of law, a fair and impartial jury trial due to the cumulative effect of errors committed by the States' prosecuting attorney, trial court judge and trial counsel during his pretrial, trial and post-trial court proceedings.(Document No. 1-8.)

The undersigned submitted his Proposed Findings and Recommendations on April 11, 2007, recommending that Petitioner's request to withdraw grounds five and seven be granted and Respondent's Motion to Dismiss for Failure to Exhaust State Court Remedies be denied. (Document No. 22.) By Memorandum Opinion and Judgment Order filed on May 3, 2007, the District Court adopted undersigned's Proposed Findings and Recommendations. (Document No. 23.) Accordingly, this matter was remanded to the undersigned for further proceedings.

2

## PROCEDURAL HISTORY

On October 20, 1998, the Grand Jury of McDowell County, West Virginia, returned an Indictment against Petitioner, charging him with three counts of murder (Counts 1 - 3), one count of burglary by breaking and entering (Count 4), and one court of burglary by entering without breaking (Count 5). State v. Allen, Criminal Action No. 98-F-103 (Cir. Ct. McDowell Co. Dec. 15, 1999); (Document No. 14-2, Exhibit 1.) Subsequently, trial counsel, Ronald D. Hassan and Keith Flinchum, filed a Motion to Suppress various statements Petitioner made to the police. (Id., Exhibit 4.) On April 5, 1999, the Court conducted a hearing on Petitioner's Motion to Suppress finding that all post Miranda statements were voluntarily made and therefore admissible. (Id.) Following a jury trial conducted on September 13 - 17, 1999, Petitioner was convicted of three counts of first degree murder (Counts 1 - 3) and one count of burglary by breaking and entering (Count 4). (Id., Exhibit 2.) On November 30, 1999, Petitioner was sentenced to life imprisonment without the possibility of parole on each murder conviction and one to fifteen years for burglary by breaking and entering, with all sentences to run consecutively. (Id., Exhibit 3.)

On March 21, 2001, Petitioner, by counsel, McGinnis E. Hatfield, appealed his conviction and sentence to the Supreme Court of Appeals of West Virginia [SCAWV], raising the following assignment of error: "The Circuit Court erred in not suppressing all post Miranda statements by the Petitioner because the police used coercive means to elicit the statements." (Id., Exhibit 4.) The SCAWV refused his Petition for appeal on April 25, 2001. (Id., Exhibit 5.) Petitioner did not file a Petition for Writ of Certiorari in the United States Supreme Court.

On August 21, 2001, Petitioner, acting *pro se*, filed a Petition for Writ of *Habeas Corpus* in the Circuit Court of McDowell County. Allen v. Painter, Civil Action No. 01-C-200 (Cir. Ct.

McDowell Co. Nov. 7, 2005); (Document No. 14-3, Exhibit 6.) Petitioner raised the following

grounds for *habeas* relief:

A.      The petitioner contends the trial court violated his United States Constitutional Rights and due process of law under the Fourteenth Amendment because the court committed reversible error in not granting a change of venue due to the extensive, negative and prejudicial pre-trial publicity, and the jury pool in the state trial was not impartial, and consequently his request for change of venue should have been granted.

B.      The petitioner contends his state and federal constitutional rights under both the West Virginia and United States Constitutions to equal protection, due process of law, a fair and impartial jury trial were violated due to ineffective assistance of counsel, violative of Article III, Sections 10, 14, and 17 of the West Virginia Constitution and the First, Sixth and Fourteenth Amendments to the United States Constitution.

C.      The petitioner contends he does have a constitutional right to discovery, he has raised a meritorious claim because the failure of the State prosecutor, Sidney Bell, to provide his defense counsel and the trial court with exculpatory information which denied his right to fully and fairly defend himself against all the felony indictments in this case during the trial proceedings. Thus, he claims he is entitled to a new trial because the prosecutor's introduction of evidence did not provide a full disclosure or discovery pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963);

D.      The petitioner contends the trial court committed reversible error when it did not suppress all post Miranda statements by petitioner because the police used coercive means to elicit said statements in violation of both his state and federal constitutional rights to remain silent;

E.      Petitioner contends the trial court erred in not granting a direct verdict of acquittal, arrest of judgment, or a new trial due to there being insufficient evidence to support guilty verdicts of three (3) counts of first degree murder. Thus, he argues the verdicts in his case are contrary to the evidence and are without merit and it to involves a question of state and federal law. Therefore, he has proven under Jackson v. Virginia, 443 U.S. 307, 319 (1979), a Jackson issue on the question of the sufficiency of the state's evidence and case in chief.

F.      The petitioner contends the trial court erred in failing to grant petitioner's motion for directed verdict of acquittal, judgment of acquittal, and to set

4

aside the jury verdict at the conclusion of the trial which violated his guaranteed right under Article II, Section 14 of the Constitution of the State of West Virginia;

G.     The petitioner proffers that the trial court committed reversible error in not granting his defense motion for a bifurcated trial, thus violating both his state and federal constitutional rights to a fair trial;

H.     The petitioner contends his constitutional rights to equal protection, due process of law, a fair and impartial jury trial were violated because the state committed reversible error in failing to conduct a proper competency evaluation and give him pretrial access to competent evaluators to determine whether his state of mind before, during and after giving alleged statements to the police made him not criminally responsible or not competent to waive his Miranda Rights which constitute a deprivation of Due Process in violation of the West Virginia Const., Art. III, § 10 and United States Const., Amend. 5, 6 and 14;

I.     The petitioner contends his constitutional rights to a full and fair trial and due process of law were violated under the United States and West Virginia Constitutions, due to prosecutorial misconduct committed by the state's prosecuting attorney, Sidney Bell.

J.     The petitioner contends all the testimony regarding alleged events occurring and inflammatory comments concerning himself and the victims and the trial court's admission of 404(b) evidence without first conducting a mandatory in camera court hearing required by court rules, including but not limited to all other contended prejudicial errors in this case, constitutes reversible error under the "plain error doctrine" and his convictions should be reversed.

K.     The petitioner contends the trial court committed numerous reversible and prejudicial errors violating all his state and federal constitutional rights to equal protection, due process of law, a fair and impartial jury trial due to the cumulative effect of errors committed by the state's prosecuting attorney, trial court judge and trial counsel during his pretrial, trial and post-trial court proceedings;

L.     The petitioner contends there may be other reversible errors, denials of both his state and federal constitutional rights to equal protection, due process of law, and a fair jury trial which may be evidence upon review of all the records, transcripts, statements and exhibits of all the proceedings including but limited to all other pretrial proceedings and all other rulings in this case and prior to the same during suppression hearings which were adverse to him.

5

(Document Nos. 14-3 and 14-4, Exhibit 6.) Petitioner was subsequently appointed counsel, Charles B. Mullins II, and an amended Petition was filed on January 7, 2005. (Document No. 14-4, Exhibit 7.) *Habeas* counsel raised the following grounds for *habeas* relief in Petitioner's amended Petition: (1) Improper Venue; (2) Suppression of Exculpatory Evidence; (3) Statements Given Under Duress and Coercion; (4) Violation of Sixth Amendment Right to Counsel; (5) Statements of Petitioner Inadmissible; (6) Unnecessary Delay in Presenting Petitioner Before Magistrate; (7) Prosecutorial Misconduct; (8) Ineffective Assistance of Counsel. (Id.) The Circuit Court conducted an omnibus *habeas corpus* hearing on May 13, 2005. (Document No. 14-5, Exhibit 8.) During the omnibus hearing, the Circuit Court heard testimony from nine witnesses including the testimony of Petitioner's trial counsel, Mr. Flinchum and Mr. Hassan.[2] (Id.) By order dated November 7, 2005, the Circuit Court summarily rejected all but two of Petitioner's grounds for relief. (Id.) The Circuit Court made findings of fact and conclusions of law addressing Petitioner's claim of involuntary confession and ineffective assistance of counsel, and denied his *habeas* petition on the merits. (Id.) On May 23, 2006, Petitioner filed his Petition for Appeal from the Circuit Court's decision, raising the following grounds:

1.      Because of extensive pretrial publication, the venue was improper, therefore, not allowing for a fair and impartial jury;

2.      The State did not make available all discoverable evidence and the evidence that was presented at trial was an abbreviated form of the original;

3.      The Appellant's Constitutional Rights were violated when the WV State Police placed the Appellant under duress and used coercion to elicit statements from him;

---

[2] The following individuals testified at the omnibus hearing: David Cooper, Verona Spriggs, Michael Spriggs, Alexander Anthony, Sr., Bradford Vaughn, Gregory Bishop, R. Keith Flinchum, Ronald D. Hassan, and Petitioner. (Document No. 14-5, Exhibit 8.)

6

4.     The Appellant's Sixth Amendment right to counsel was violated when, during his transport from Richmond, VA to Welch, WV, incriminating statements were obtained through interrogation by the WV State Police Officers;

5.     The two (2) separate statements from the Appellant made should have been inadmissible at trial because the Appellant's state of mind, his physical health, when the first statement was given. In addition, the second statement was given under duress, as well as coercion being used to elicit the second statement;

6.     The Appellant's constitutional rights were violated when he was not presented to the McDowell County Magistrate "without unnecessary delay," as provided for in West Virginia Code § 62-1-5;

7.     The prosecutor in this case wrongly urged the jury in his closing argument, to put themselves in the place of the person who had been offended and to render a verdict as if they were similarly situated. This type of prosecutorial misconduct is improper in any litigation. Additionally, the Prosecutor, in the beginning moments of his closing argument, once again made an improper and prejudicial remark when he referred to the Appellant as a "murderer," when in fact the Appellant had not been found guilty, as of yet, by a jury of the crime of murder;

8.     Ineffective assistance of counsel.

Allen v. State of West Virginia, Case No. 061362 (W.Va. June 29, 2006)(Document No. 14-5, Exhibit 9.) The West Virginia Supreme Court of Appeals refused Petitioner's appeal on June 28, 2006. (Id., Exhibit 10.)

Petitioner filed his instant Section 2254 Petition in this District Court on August 1, 2006. (Document No. 1.) By Order entered on November 22, 2006, the undersigned directed Respondent to show cause, if any, why Petitioner's Petition should not be granted. (Document No. 10.) In response to the Court's Order, Respondent filed on December 21, 2006, his Motion to Dismiss Petition for Failure to Exhaust State Remedies and Memorandum in Support Thereof. (Document Nos. 13 - 14.) Respondent argued that grounds five and seven were never presented to the West

Virginia Supreme Court of Appeals and therefore, were not exhausted, requiring the dismissal of the instant Petition. Alternatively, Respondent asserted that Petitioner may be permitted to withdraw his unexhausted claims and proceed to a decision on the merits of only those claims that have been fully exhausted pursuant to Rose v. Lundy, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

On December 28, 2006, Petitioner filed his "Reply to Respondent's Motion to Dismiss Petition for Failure to Exhaust State Remedies." (Document No. 17.) Petitioner acknowledged that his Section Petition contained two unexhausted claims as indicated in Respondent's Motion to Dismiss and moved the Court to permit him to withdraw the unexhausted claims and allow him to proceed on the remaining claims which have been exhausted. Notwithstanding Petitioner's Reply, notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Petitioner on March 14, 2007, advising him of his right to file a response to Respondent's Motion to Dismiss. (Document No. 18.) On April 3, 2007, Petitioner filed a further Response to Respondent's Motion to Dismiss. (Document Nos. 19 - 20.) Petitioner again acknowledged that he has failed to exhaust two of the claims raised in his Section 2254 Petition and indicated that he wished to withdraw the unexhausted claims and proceed on only those claims which are fully exhausted.(Document No. 20-2, pp. 43 - 44.) The undersigned submitted his Proposed Findings and Recommendations on April 11, 2007, recommending that Petitioner's request to withdraw grounds five and seven be granted and Respondent's Motion to Dismiss for Failure to Exhaust State Court Remedies be denied. (Document No. 22.) By Memorandum Opinion and Judgment Order filed on May 3, 2007, the District Court adopted the undersigned's Proposed Findings and Recommendations and directed the Respondent to file an answer on the merits of Petitioner's exhausted claims. (Document No. 23.) Accordingly, this matter was remanded to the undersigned for further proceedings.

On July 27, 2007, Petitioner filed his Motion to Grant Habeas Corpus Petition "based upon the failure of the Respondent to comply with this Court's Order of May 3, 2007, ordering Respondent to file an answer to the allegations contained in the Petitioner's Petition . . .." (Document No. 24.) Respondent filed a Response to Petitioner's Motion on July 27, 2007, acknowledging that the District Court had ordered him to file an answer addressing the merits of Petitioner's exhausted claims and stating that "[t]he District Court did not set a due date, or briefing schedule. Respondent requests that the Court set a briefing schedule." (Document No. 25.) Petitioner filed a Reply to Respondent's Response on August 2, 2007, restating that his Section 2254 Petition should be granted because Respondent has not filed an Answer as the District Court directed. (Document No. 26.) On January 9, 2008, Petitioner filed a Motion to Compel Respondent's Answer on the Merits and Provide Trial Transcripts to Petitioner and the Court. (Document No. 27.)

By Order entered on January 28, 2008, the undersigned directed Respondent to show cause, if any, why Petitioner's Petition should not be granted. (Document No. 28.) By Proposed Findings and Recommendation also filed on January 28, 2008, the undersigned recommended that the District Court deny Petitioner's Motion to Grant Habeas Corpus Petition. (Document No. 29.) The District Court adopted the undersigned's Proposed Findings and Recommendations by Memorandum Opinion and Judgment Order filed on March 3, 2008. (Document No. 35.) On April 14, 2008, in response to the Court's Order, Respondent filed his Consolidated Response, Motion to Dismiss, and Motion for Summary Judgment. (Document Nos. 36 and 37.) Petitioner filed his Response on April 16, 2008. (Document Nos. 38 and 39.) On April 21, 2008, Petitioner filed his objection to Respondent's Motion for Summary Judgment. (Document No. 41.) Notwithstanding Petitioner's Reply, notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to

Petitioner on April 25, 2008, advising him of his right to file a response to Respondent's Motion for Summary Judgment. (Document No. 42.) On May 9, 2008, Petitioner filed an affidavit in support of his Petition. (Document No. 43.) Petitioner filed a "Motion for Order Granting the Petition for Writ of Habeas Corpus" on June 19, 2008. (Document No. 44.)

## THE APPLICABLE STANDARDS

Federal *habeas* relief is available to a State prisoner under 28 U.S.C. § 2254, only if the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a)(2002); See also Sargent v. Waters, 71 F.3d 158, 160 (4th Cir. 1995). Section 2254(d) provides that when the issues raised in a Section 2254 Petition were raised and considered on the merits in State Court *habeas* proceedings, federal *habeas* relief is unavailable unless the State Court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court stated that under the "contrary to" clause in § 2254(d)(1), a federal *habeas* Court may grant *habeas* relief "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13, 120 S.Ct. at1523. A federal *habeas* Court may grant relief under the "unreasonable application" clause of § 2254(d)(1) where the State Court identified the appropriate Supreme Court precedent but unreasonably applied the governing principles. Id. In determining whether the State Court's decision was contrary to, or was

an unreasonable application of, Supreme Court precedent, all factual determinations by the State

Court are entitled to a presumption of correctness. 28 U.S.C. § 2254(e).[3] On this framework,

consideration should be given to Respondent's Motion to Dismiss and for Summary Judgment.

## Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no

genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.

Once the moving party demonstrates the lack of evidence to support the non-moving party's claims,

the non-moving party must go beyond the pleadings and make a sufficient showing of facts

presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106

S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the

---

[3] Title 28, U.S.C. Section 2254(e) provides:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
    (A) the claim relies on –
        (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

11

light most favorable to the non-moving party. <u>Matsushita</u>, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. <u>Celotex</u>, 477 U.S. at 322 - 23, 106 S.Ct. at 2552 - 53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 - 48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Petitioner's claims, summary judgment is appropriate.

### **FACTUAL BACKGROUND**

On February 14, 1998, Jeanette Henderson, David Henderson, and Martha Barber were shot to death in the "Henderson house." Evidence presented at trial revealed that Jeanette and David were married, but Jeanette had been involved in a long term affair with Petitioner. Jeanette's mother, Martha, had recently moved in with David and Jeanette because Martha was ill and could not live alone. Petitioner was convicted based upon evidence that linked Petitioner's two guns to the murders.

The bodies of the victims were discovered by the West Virginia State Police on February 15, 1998, following a "welfare check" by the Northfork Volunteer Fire Department. Timothy Taylor testified that he was a member of the Northfork Volunteer Fire Department. (Document No. 36, Exhibit 15, p. 6.) He stated that he received a call around 5:30 p.m. on February 15, 1998, concerning a welfare check at the Henderson house. (<u>Id.</u>, pp. 6 - 7.) Mr. Taylor stated that he traveled to the Henderson house and upon arriving he could see a "TV through the window" and three lights on in the home. (<u>Id.</u>, pp. 7, 10 - 11.) Mr. Taylor stated that he knocked on the door at the

main entrance, but there was no answer. (<u>Id.</u>, p. 9.) He testified that he went around the house continuing to knock on different doors, but there was no response. (<u>Id.</u>, pp. 9 - 10.) Mr. Taylor stated that he "noticed the storm door was open" at the top of the concrete steps, but he "didn't go to that door because I know from being there before that nobody uses that door." (<u>Id.</u>, p. 10.) Mr. Taylor testified that he "noticed that the paper box still had the Saturday and Sunday papers in it, which kind of – I didn't feel right about what I had seen." (<u>Id.</u>) Mr. Taylor stated that he contacted the 911 center "and told them of what I had seen . . . and I asked them if they could get me some law enforcement up there, because I didn't want to enter the house without proper authorization." (<u>Id.</u>, p. 12.) Mr. Taylor testified that he also contacted James Grant, the Chief of the Volunteer Fire Department, and requested that additional men be sent to assist him. (<u>Id.</u>, p. 13, 20 - 22.) Mr. Taylor stated that once additional assistance from the fire department arrived, they again walked around the house checking the entrances and checked the entrance with the open storm door. (<u>Id.</u>, p. 14.) Mr. Taylor testified that "we tapped on it, it kind of went open. And that's when we kind of noticed that there was splinters on the door and stuff was in the floor." (<u>Id.</u>, pp. 14 - 15, 22.) Mr. Taylor and Mr. Grant stated that they again contacted the 911 center, which advised them to proceed into the house. (<u>Id.</u>, pp. 15 and 23.) Mr. Taylor and Grant testified that they proceed about 20 or 30 yards and observed a bullet projectile laying on the floor, two holes in the door, and blood coming out the door. (<u>Id.</u>, pp. 16 and 23.) Mr. Taylor stated that he then advised everyone to be careful and back out of the house. (<u>Id.</u>, p. 17.) Mr. Grant testified that they backed out of the house "because we realized it was a crime scene and we didn't want to mess anything up." (<u>Id.</u>, p. 23.) Mr. Taylor and Mr. Grant testified that they then secured the scene until law enforcement officers arrived. (<u>Id.</u>, pp. 17 and 24.) Mr. Taylor stated that he did not see the Petitioner near the Henderson house. (<u>Id.</u>, p.

13

19.)

Troopers Bishop, Cochran, and Bledsoe were the first officers to arrive on scene at the Henderson house. Trooper Bishop testified that he received a call on February 15, 1998, "[t]hat the Northfork Volunteer Fire Department had gone to the residence and that they needed the State Police to get out there as soon as they could." (Document No. 36, Exhibit 15, p. 74.) Trooper Bishop stated that he was accompanied by Trooper Cochran and they arrived on scene around 9:00 p.m. (Id., pp. 74 - 75.) Trooper Cochran stated that he and Trooper Bishop began searching the house then Trooper Bledsoe arrived and joined in the search. (Id., Exhibit 16, pp. 52 and 235.) Troopers Bishop and Cochran testified that the scene was secure upon their arrival and they proceed into the house through the same entrance that the firefighters had entered. (Id., Exhibit 15, pp. 76 - 77.) Troopers Bishop, Cochran, and Bledsoe stated that they "discovered the body of Martha Barber in the downstairs bathroom." (Id., Exhibit 15, p. 78 and Exhibit 16, pp. 52, 236.) Troopers Bishop and Cochran testified that David's body was found on the second floor and he had "received a contact wound to the head." (Id., Exhibit 15, p. 80 and Exhibit 16, p. 52.) Troopers Bishop and Cochran noted that there was a "military style boot print in blood" near David's body and a second boot print "on the step going up before you get to the landing where Jeanette was located." (Id., Exhibit 15, pp. 80, 83 and Exhibit 16, p. 55.) Trooper Cochran later acknowledged that they were never able to match the boot print to Petitioner. (Id., Exhibit 16, pp. 89, 98.) Troopers Bishop and Cochran stated that Jeanette's body was discovered on the landing near the attic and she had "what appeared to be real close to contact wounds also to the head." (Id., Exhibit 15, p. 80 and Exhibit 16, p. 52.) Trooper Bishop described the scene as follows: "There was spent nine millimeter casings laying everywhere. There was actually ball-round projectiles that had gone through the body and hadn't penetrated the

14

wood or anything, it was laying around. There was also rounds that had not been fired laying around

the bodies." (<u>Id.</u>, Exhibit 15, pp. 80 - 81.) Trooper Bishop testified that he contacted the State Police

lab for additional assistance due to the number of bodies and the amount of evidence. (<u>Id.</u>, p. 84.)

Trooper Bishop stated that the following experts were sent to assist in gathering evidence: Trooper

Myers, whose specialty is biochemistry, and Trooper Neal, whose specialty is fingerprinting. (<u>Id.</u>)

Trooper Bishop testified that they did not recover all of the projectiles because "[w]e recovered what

we thought was practical without tearing into the walls and what have you; the floors." (<u>Id.</u>, p. 208.)

Trooper Bishop testified that in the course of the investigation they found receipts to Cellular

One, which "had been paid by Jeanette Henderson for Stanford Allen." (<u>Id.</u>, pp. 119, 140 - 142.)

Trooper Cochran testified that he pressed redial on the phone in the living room section of the

Henderson house "and it went to Mr. Allen's house." (<u>Id.</u>, Exhibit 16, p. 56.) Trooper Cochran stated

that when Petitioner answered the phone, he asked Petitioner "what his name was, and asked him

if we could come over and talk to him." (<u>Id.</u>). Trooper Bishop stated that they determined it was

necessary to speak with Petitioner "to see if he had any information, if he could help us out any

during the investigation of the crime." (<u>Id.</u>, Exhibit 15, p. 122.) Trooper Bishop testified that the

following individuals accompanied him to Petitioner's residence: Trooper Cochran, Trooper

Schoolcraft, and Trooper Chambers. (<u>Id.</u>, p. 123.) Trooper Bishop stated that he had spoke with

Petitioner on "numerous occasions," but on February 16, 1998, Petitioner acted differently: "[H]e

was obviously in a nervous condition. Whenever I spoke with him, he tended not to look at me. And

he got me a little bit suspicious just the way he was acting. He was acting differently than the times

before." (<u>Id.</u>, p. 124.) Trooper Cochran stated Petitioner "appeared to be extremely nervous and

tired." (<u>Id.</u>, Exhibit 16, p. 58.) Troopers Bishop and Cochran testified that they requested permission

15

to search Petitioner's residence, advised him of his rights, and Petitioner signed a Consent to Search form. (Id., Exhibit 15, pp. 124 - 29 and Exhibit 16, p. 58.) Troopers Cochran and Bishop stated that they found a receipt from Hardware Charlie's for a Ruger 9mm and a Tech-9, which indicated that the guns were picked up on December 12, 1997. (Id., Exhibit 15, pp. 132 - 133, 143 and Exhibit 16, p. 60.) Troopers Cochran and Bishop testified that when they asked Petitioner where the Ruger 9mm and Tech-9mm were located, he showed them where the Ruger 9mm was hid inside the wall of the closet with the water heater. (Id., Exhibit 15, p. 133 and Exhibit 16, pp. 61 - 62.) Trooper Bishop and Cochran stated that the Ruger was located in a plastic case and the gun was "caked in packing grease," which is "grease that you pack a weapon with when you're packing it away to keep for a long time, like you don't have intent of using it." (Id., Exhibit 15, p. 134 and Exhibit 16, p. 62.) Trooper Bishop stated that the Ruger recovered from Petitioner's home was the same weapon identified in the December 12, 1997, receipt from Hardware Charlie's. (Id., Exhibit 15, p. 145.) Trooper Cochran testified that Petitioner stated the following concerning the location of the Tech-9mm: "He mentioned that he believed that Jeanette Henderson had that gun, he give it to her. And he believed that she put it in the upstairs attic, is what he told us." (Id., Exhibit 16, p. 63.)

Troopers Bishop and Cochran stated that following the search of Petitioner's residence, Petitioner "agreed to come to the State Police Office and speak with us." (Id., Exhibit 15, p. 148 and Exhibit 16, p. 64.) Troopers Bishop and Cochran testified that Petitioner agreed to be interviewed and an Interview and Miranda Warning sheet was reviewed and signed by Petitioner. (Id., Exhibit 15, pp. 150 - 53 and Exhibit 16, pp. 65 - 66.) Troopers Bishop and Cochran stated that the interview resulted in two statements by Petitioner: One at 1:38 p.m. on February 16, 1998, and the other at 4:34 p.m. on February 16, 1998. (Id., Exhibit 15, pp. 154 - 59 and Exhibit 16, pp. 65 - 66.) Trooper

Bishop further stated that on February 16, 1998, a gunshot residue examination was conducted on Petitioner's hands and face and there "were not any particles of gunshot residue identified on the above items." (Id., Exhibit 15, pp. 213 - 14.) Trooper Bishop then testified that they obtained a search warrant on February 18, 1998, to search the area around Petitioner residence. (Id., pp. 161 - 62.) Troopers Bishop and Cochran stated that they executed the warrant on February 19, 1998, and recovered twenty or thirty 9mm shell casings and a Tech-9mm from the coke oven. (Id., Exhibit 15, pp. 164 - 68 and Exhibit 16, pp. 69 - 70.) Trooper Bishop testified that the Tech-9mm recovered from the coke oven was the same weapon identified in the December 12, 1997, receipt from Hardware Charlie's. (Id., pp. 145 - 46, 168.)

Trooper Scott VanMeter testified that when he learned that Petitioner had been transferred to the Veteran's Hospital in Richmond, Virginia, he contacted the hospital to check Petitioner's condition. (Id., Exhibit 16, p. 9.) Trooper VanMeter stated that when he called the Veteran's Hospital "I got the switch board operator, and I asked to be connected to - - I needed to speak to the doctors of Stanford Allen. And they actually connected me to Stanford Allen. He actually answered the phone." (Id., p. 10.) Trooper VanMeter testified that Petitioner stated the following:

> At that time, Mr. Allen, he - - he mentioned to me that he talked to me before, and I didn't recall then, but he reminded me of an investigation where he had some guns stolen. He told me he'd been set up and I stated that I would like to come and talk to him, and he agreed to that, and – to which I did.

(Id., p. 11.) Troopers VanMeter and Bishop stated that they traveled to the Veteran's Hospital on February 25, 1998, to meet with Petitioner. (Id., Exhibit 15, pp. 179 - 81 and Exhibit 16, p. 12.) Troopers VanMeter and Bishop testified that they met with Petitioner in a conference room at the hospital and Petitioner was advised of his Miranda rights. (Id., Exhibit 15, p. 181 and Exhibit 16, p. 13.) Trooper VanMeter stated that Petitioner then told "his side of the story," which Trooper

VanMeter "started putting down on paper, and then, you know, as I put it on paper I reviewed with him, read it to him and let him look at it, and then he signs it." (Id., Exhibit 16, pp. 17 - 18.) Trooper VanMeter stated that Petitioner alleged that he was being set up by Alexander Anthony, Chester Spriggs, and Mark Dean. (Id., pp. 24 - 25.) Trooper VanMeter testified that after giving his statement, Trooper Bishop entered the room and also advised Petitioner of his <u>Miranda</u> rights. (Id., p. 29.) Trooper VanMeter testified that Trooper Bishop then informed Petitioner that his Ruger 9mm had been used to kill Jeanette and Petitioner reacted as follows (Id.):

> Stanford Allen became very upset. He started crying and he said, "You'll got me. You know I did it, but I can't admit it because I love Jeanette." And then he became very emotional and upset, and that was the end of the interview.

Troopers Bishop and Cochran stated that they took Petitioner into custody on March 2, 1998, in Richmond, Virginia, and transported him back to McDowell County, West Virginia. (Id., Exhibit 15, p 186 and Exhibit 16, p. 74.) Trooper Bishop testified that "as soon as we took custody of him, I read him his Miranda Rights from a card." (Id., Exhibit 15, p. 187.) Trooper Bishop stated that on the way back to West Virginia, Petitioner "again stated that he had killed Martha Barber, Jeanette Henderson, and David Henderson." (Id.) Trooper Cochran testified that the following occurred during Petitioner's transportation: "Trooper Bishop – when we put him in the car there at the Richmond Jail, Trooper Bishop immediately told him of his constitutional rights again. Then we just had a casual conversation about this all the way back home. He eventually admitted to us to – that – that he had killed the Henderson's and Ms. Barber." (Id., Exhibit 16, p. 76.) Trooper Cochran stated that Petitioner's explanation for the murders was "that normally he wouldn't do something like this, but that he had – had smoked crack cocaine, and he believed that's what caused him to do it." (Id.) Trooper Bishop testified that once they arrived at the State Police detachment, "the first

18

thing I remember him doing is apologizing to Sergeant VanMeter; shook Sergeant VanMeter's hand and stated he wanted to make a statement, wanted to get it off his chest, or something to that nature, he told Sergeant Vanmeter."(Id., Exhibit 15, p. 187.) Trooper Bishop explained that Petitioner apologized to Sergeant VanMeter because he had lied to Sergeant VanMeter.[4] (Id., p. 188.) Troopers Bishop and Cochran testified that Petitioner gave "a written statement and an audio statement to us." (Id., Exhibit 15, p. 188 and Exhibit 16, p. 77.) Trooper Bishop stated that "I particularly noted that he had details of the crime, he knew where each body was located, and what have you." (Id., Exhibit 15, p. 188.) Trooper Cochran read Petitioner's written statement to the jury, which stated as follows:

> On Friday 2-13-98, I got an eight-ball of crack cocaine from my nephew, Chester Spriggs. Jeanette Henderson called me early Saturday morning. I went to her house, and her and David wanted to have sex. I told them no, and every thing got out of control. I pulled out my gun and shot David. Jeanette went to the attic to get the Tech-9 I gave her. She came down the attic steps and she shot a couple of times and I shot her. They both laid there, and I went downstairs. I heard something, and seen a lady in the bathroom. I shot her twice, I think, and I left and went home.
>
> I packed the guns with grease and put them behind the wall by the water heater. I later put the Tech 9 in the coke oven, on the hill behind where I stay. Those are the guns the police got from my house.
>
> I normally wouldn't do this, but that crack is a bad drug. I need some help.
>
> I gave this statement voluntarily on my own free will. No threats or promises were made to me. I've had my rights read to me and I understand them. I wanted to tell what happened to get it off my chest. It's been bothering me kept inside of me. This statement is true and correct to the best of my knowledge.

(Id., Exhibit 16, pp. 82 - 83.)

James Kaplan, the Chief Medical Examiner for the State of West Virginia, testified that he

---

[4] Trooper VanMeter testified that Petitioner "reached out and shook my hand and apologized for not telling me the whole truth, and he admitted to killing the Henderson's and Ms. Barber." (Document No. 36, Exhibit 16, p. 32.)

performed autopsies on the body's of David Henderson, Jeanette Henderson, and Martha Barber. (Id., Exhibit 15, pp. 290 - 92.) First, Dr. Kaplan testified that David had five gunshot wounds "that passed through his body" with no bullets recovered. (Id., p. 293, 295 - 300.) Dr. Kaplan stated that one entrance wound showed evidence of close-range firing, but he could not determine the sequence of the wounds. (Id., pp. 66 and 83.) Dr. Kaplan stated that the gunshot wound to David's cheek was a contact wound because "the skin around the gunshot wound to Mr. Henderson's cheek was burned, but didn't have any – any stippling and was very little suet there, if any. What that tells me is that – that the – that the gun was – was tight up against Mr. Henderson's skin." (Id., p. 297.) Dr. Kaplan testified that the exit wounds had characteristics indicating that "Mr. Henderson's posterior was pressed up against a surface which supported him at the time those bullet's exited. So, either – either he was up against a wall or he was on the floor." (Id., p. 299.) Dr. Kaplan stated that the gunshot wound to David's left cheek and the left back of the neck would have been fatal wounds. (Id.) Second, Dr. Kaplan testified that Martha Barber "died as a result of seven gunshot wounds."  (Id., p. 301.) Dr. Kaplan stated that several of the wounds were contact wounds. (Id., pp. 302- 03.) Dr. Kaplan testified that the following gunshot wounds would have been fatal to Martha: the gunshot to the left cheek; the gunshot to the right lateral eye; the gunshot to the right chin; and the two gunshots to the left lateral neck. (Id., pp. 304 - 05.) Third, Dr. Kaplan testified that Jeanette Henderson had five gunshot wounds: two to her head, one over her heart, one to her right breast, one to her abdomen, and one to her left hand. (Id., p. 306.) Dr. Kaplan testified that he recovered the bullet from the gunshot wound to Jeanette's right breast, which was the "only bullet recovered from all three victims." (Id., p. 308.) Dr. Kaplan stated that the following gunshot wounds would have been fatal to Jeanette: the gunshot to the forehead; gunshot wound to the back of the head; the

gunshot wound to her chest. (Id., pp. 308 - 09.) Dr. Kaplan testified that he could not determine the sequence of the wounds to any of the victims. (Id., p. 311.)

Clarence Ralph Lane, a West Virginia State Trooper, testified that he works in firearm and tool mark identification. (Id., Exhibit 17, pp. 13 - 14.) Trooper Lane explained to the jury how you generally go about examining firearms, projectiles, or bullets that are submitted for comparison purposes. (Id., pp. 15 - 18.) Trooper Lane testified that a person could fire a Ruger 9mm fourteen times without reloading the weapon, and could fire a Tech-9mm at least thirty times without reloading the weapon. (Id., pp. 25, 28 - 29.) Trooper Lane stated that he test fired the Ruger 9mm that was recovered from Petitioner's residence, and Tech-9mm that was recovered from the coke oven. (Id.) Trooper Lane stated that he compared the bullet recovered from Jeanette's body with bullets from his test fire, and he concluded that "the fired bullet from Dr. Kaplan was fired from the Ruger handgun." (Id., p. 32.) Trooper Lane further testified that he compared bullets recovered from the crime scene with his test fires and concluded that they were fired from either the Tech-9mm or the Ruger. (Id., p. 34 - 36, 38 - 43.) Trooper Lane explained that on some occasions there are not distinctive marking to make a determination, and that he was unable to reach an opinion as to some of the casings. (Id., pp. 44 - 47.) Trooper Lane further stated that he was unable to link any unfired rounds to any weapon. (Id., p. 76.)

Mark Neal, a West Virginia State Trooper, testified that he is the "section head of the latent print section, which is part of the forensic laboratory." (Id., Exhibit 17, p. 117.) Trooper Neal stated that on February 16, 1998, he was directed by his supervisor to accompany Trooper Myers to McDowell County assist in the collection evidence in a triple murder. (Id., p. 119.) Trooper Neal testified that he "took lifts of fingerprints and processed four fingerprints at the scene around where

the bodies were found and areas that were traveled. I also proceed and photographed shoe prints that were there on the floor." (Id., p. 120.) Trooper Neal stated that he "took 14 lifts of latent prints" and "there were 10 identifiable fingerprints within those lifts." (Id., p. 122.) Trooper Neal testified that "the only prints that were identified were identified as - - are prints of the victims." (Id.) Trooper Neal stated that there was one latent fingerprint that did not belong to the victims and there were other prints that were not identifiable because there were not enough characteristics to identify them. (Id., p. 122 - 23.) Trooper Neal testified that Petitioner's fingerprints were not found at the crime scene. (Id., p. 123.) Trooper Neal stated that he examined the Ruger, but was unable to lift any latent prints due to the grease that was on the weapon. (Id., p. 125.) Trooper Neal also testified that he examined the Tech-9mm, but was "not able to lift any prints that were of sufficient quality to be compared with some persons fingerprints." (Id., p. 126.) Trooper Neal stated that he examined some live rounds and unfired rounds of ammunition, but was unable to lift any identifiable prints. (Id., p. 129.)

Howard Myers, a West Virginia State Trooper, testified that he "receives examining evidence pertaining to blood, semen and other body fluids" for DNA testing. (Id., Exhibit 17, p. 141.) Trooper Myers stated that he collected blood samples from the Henderson house on February 16, 1998. (Id., pp. 145 - 50.) Trooper Myers stated that he was able to extract a blood sample from inside the barrel of the Tech-9mm, which matched the DNA of Martha. (Id., pp. 163 - 67.) Trooper Myers testified that the results of the comparison tests revealed that the blood samples matched the DNA of the victims. (Id., pp. 171 - 73.) Trooper Myers stated that "none of the items that I tested was the blood consistent with Mr. Allen." (Id., p. 180.) Trooper Myers testified that he would not have scraped through any polyurethane to get to any old stains on the floor because he was only

22

interested in stains on the surface. (Id., p. 153, 174 - 76.) Trooper Myers, however, acknowledged that Anita Matthews' report revealed that the blood sample scraped from under the polyurethane did not match the DNA of the victims or Petitioner. (Id., p. 185.)

David Brundage testified that he is the tool marks and firearm examiner for the Indianapolis Marion County Forensic Services Agencies. (Id., Exhibit 17, p. 250.) Mr. Brundage stated that he had examined 21 fired cartridge cases and determined that only six had been fired from the Ruger 9mm or Tech-9mm. (Id., p. 258.) Mr. Brundage testified that he had reviewed the medical examiner's report and he believed Jeanette was shot "[f]rom an angle - - a high angle, above the victim, 45 or greater. A couple of them from almost straight down." (Id., p. 270.) David Brundage testified that the bullet removed from Jeanette's body, which was determined by Trooper Lane to have been fire from the Ruger, was not sent to him for examination. (Id., p. 259.)

Robert White testified that he works as a forensic scientist for attorneys, police departments, and insurance companies. (Id., Exhibit 17, p. 283.) Mr. White testified that he visited the Henderson house on November 14, 1998, to collect blood samples. (Id., pp. 283 - 84.) Mr. White stated that he collected 20 samples to be tested for blood, which were sent to Anita Matthews at Laboratory Corporation of America for testing. (Id., pp. 284 and 297.) Mr. White acknowledged that he scraped through varnish or polyurethane on the hardwood in order to obtain one of the blood samples that he collected on the second floor of the home. (Id., pp. 303 - 04.) Mr. White testified that he was later advised that the blood sample removed from under the polyurethane did not belong to any of the victims or Petitioner. (Id., p. 305.)

Bradford Vaughn testified that he is a private investigator for the State and does private work for attorneys. (Id., Exhibit 18, p. 63.) Mr. Vaughn stated that he visited the Henderson house to two

23

occasions to conduct an investigation. (Id., p. 65.) Mr. Vaughn testified that he removed one bullet during his visit on March 8, 1998, which he immediately gave to Trooper Bishop. (Id., pp. 67 - 68, 83 - 84.) Mr. Vaughn stated that he removed two bullets out of the floor of the Henderson house during his second visit, which he kept in his possession. (Id., p. 66.) Mr. Vaughn testified that all the bullets he removed appeared to be 9mm hard ball ammunition. (Id., p. 83.)

Petitioner stated that he did not kill Jeanette, David, or Martha. (Id., Exhibit 18, p. 147.) Petitioner testified that he believed Dana Martin had Jeanette killed and that Chester Spriggs, Mark Dean, Michael Spriggs, and Joe Steele framed Petitioner for the murders. (Id., pp. 145 - 46.) Petitioner testified that Jeanette was the bookkeeper for the drug cartel and she was trying to get out of it. (Id., p. 143 - 45.) Petitioner stated that Jeanette was afraid because she had been threaten by the drug cartel. (Id., p. 145.) Petitioner acknowledged that he had an intimate relationship with Jeanette. (Id., p. 91.) Petitioner stated that he and Jeanette had been in a relationship for ten years and he saw Jeanette once a week up until her death. (Id., p. 91 - 92.) Petitioner testified that he and Jeanette were discrete about their relationship and to his knowledge David was unaware of the affair. (Id., p. 92.) Petitioner stated that on February 13, 1998, Jeanette called him around 10:00 a.m. to tell him not to go anywhere that day because it was "Friday the 13th." (Id., p. 93.) Petitioner testified that after he received Jeanette's call he "went to Commercial Credit in Bluefield" to obtain money "to pay a drug debt" and that he returned from Bluefield around 12:30 in the afternoon. (Id., pp. 93 - 94.) Petitioner stated that he borrowed $854, which he paid to Chester Spriggs for cocaine. (Id., p. 94.) Petitioner testified that he returned home after paying Chester and that Larry Vaden came to Petitioner's house and they "got high." (Id., p. 96.) Petitioner stated that he "stayed home and watched TV" the rest of the day on Friday. (Id., pp. 96 - 97.) Petitioner testified that Jeanette called

24

him around 10:00 p.m. on Friday 13, 1998. (Id., pp. 104 - 05.) Petitioner further stated that he called

911 at 10:00 p.m. and at midnight on Friday 13, 1998, because Joe Steele kept driving by

Petitioner's house and Petitioner "feared for [his] life."[5] (Id., pp. 100 - 02.) Petitioner testified that

after calling 911, he called Jeanette back and "chit-catted for about an hour," and then "took two 10

milligram of Valium and went to sleep." (Id., pp. 103 - 06.) Petitioner testified that he did not get

up until noon on February 14, 1998. (Id., p. 108.) Petitioner stated that he had a gun on his coffee

table on the night of February 13, 1998, but when he woke up the next day the gun was on his

kitchen table. (Id., pp. 107 - 10.) Petitioner explained that his house has been broken into several

times by Chester Spriggs, Mark Dean, and Alexander Jink Anthony. (Id., p. 110.) Petitioner stated

that he had three guns stolen, that were not recovered. (Id., p. 111.) Petitioner identified the Tech-

9mm and stated that he had given to gun to Jeanette and she hid it in a cubby hole in the attic of the

Henderson house. (Id., p. 112.)

Petitioner testified that Larry Vaden visited him on February 14, 1998, and they "smoked

marijuana" then "Larry left, and I went back to sleep." (Id., p. 113.) Petitioner stated that he waited

for Jeanette to call on February 15, 1998, but she never called so he tried to call her a couple of times

and drove to the driveway at the Henderson house and turned around when he saw Jeanette and

David's cars in the driveway. (Id., pp. 115 - 16.) Petitioner testified that he ate "supper, and just laid

around" the rest of the day. (Id., p. 118.) Petitioner stated that he received a call from Jeanette's

house on February 16, 1998, at about 5:30 a.m. and a West Virginia State Trooper asked Petitioner

---

[5] Petitioner testified that prior to February 13, 1998, Mark Dean, Joe Steele, and another
individual "drove by and put two shotgun blast in my bedroom and they riddled my trailer with 9mm
rounds" because they were involved in a drug cartel and "wanted to eliminate me." (Document No.
36, Exhibit 18, pp. 97 - 98.)

to identify himself. (Id., p. 119.) Petitioner testified that a few minutes later six police officers were at his residence. (Id., p. 120.) Petitioner testified that he signed the consent to search form because the officers threaten to put him in jail if he didn't sign it. (Id., p. 122.) Petitioner stated that the officers then put him in handcuffs and transported him to the State Police office in Welch. (Id., p. 124.) Petitioner testified that they arrived at the State Police office in Welch around 6:30 a.m. and he was held there for "at least 12 hours" without food and was taken home without his shoes. (Id., p. 126.) Petitioner stated that he was admitted to the hospital on February 17, 1998, and released on February 23, 1998, because he suffered a heart attack due to the stress of the State Police interrogation. (Id., pp. 129 - 30.) Petitioner testified that he did not invite Trooper VanMeter to visit him at the Veteran's Hospital. (Id., p. 131.) Petitioner stated that Trooper VanMeter and Trooper Bishop traveled to the Veteran's Hospital and interrogated Petitioner for an hour in a conference at the hospital. (Id., p. 132.) Petitioner testified that he never confessed to killing Jeanette, David, or Martha during the interrogation at the hospital. (Id., p. 134.) Petitioner stated that during his transportation back to West Virginia, Trooper Bishop and Trooper Cochran "stuck a gun in [his] face" and force him to confess. (Id., pp. 138 - 41.)

Larry Wayne Beadman testified that he was friends with Petitioner and would often visit with Petitioner. (Id., Exhibit 16, p. 121.) Mr. Beadman stated that he visited Petitioner on February 13, 1998, at approximately 4:00 p.m.. (Id., p. 122.) Mr. Beadman testified that he observed a handgun "laying on the coffee table." (Id.) Mr. Beadman stated that February 13, 1998, was the last time he saw Petitioner, but that he had talked to Petitioner on the phone on Saturday. (Id., p. 123.)

Michael Spriggs testified that he is the nephew of the Petitioner. (Id., Exhibit 16, p. 126.) Mr. Spriggs explained that he saw Petitioner in the early morning hours on February 14, 1998:

Well, he banged open the door. He was knocking on the door, and then I opened the door, and then he wanted Junior. And then I went back in there and went to sleep. And I guess around 4:00 or 4:30 [a.m.] he came back and I answered the door. Him and Mark Dean was at the door, and I went back in, and I was trying to wake Junior up.

(Id., p. 127.) Mr. Spriggs acknowledged that in his February 20, 1998, written statement to Trooper Bledsoe, that he "believed that Tony, the defendant, was wearing black army boots." (Id., p. 129.) Ms. Spriggs further testified that he saw Petitioner at a friend's house around noon on February 14, 1998, and "I believe he has on his gun and holster." (Id., p. 130.)

Mark Anthony Dean testified that on February 14, 1998, at approximately 4:00 a.m. Petitioner knocked on his door wanting to go to Chester Sprigg's house. (Id., Exhibit 16, pp. 144 - 45.) Mr. Dean testified that once they arrived at Chester's house, Petitioner "asked me and Chester did we want to use his car and his gun. And we was like, 'What are we going to use your car and gun for?' We was like, 'No.'" (Id., p. 145 - 46.) Mr. Dean also described seeing Petitioner at Chester's house on the afternoon of February 14, 1998, as follows: "Well, I woke up out of the bed and I come outside to get some air, and I seen him going in Chester's and them house, you know. He had some beer. I asked him if I can have a beer, and he said, 'Come on down and get one.' And I went down there and got one. And we was sitting in there and I said - - I was sitting in the kitchen, and he had his 9mm and then he pass it around the room, you know like that, and everybody handed it back to him. I didn't touch it though." (Id., pp. 146 - 47.) Mr. Dean testified that he recognized the gun to be a Ruger 9mm. (Id., p. 147.)

Chester Spriggs, Jr., testified that he is the nephew of the Petitioner. (Id., Exhibit 16, p. 163.) Mr. Spriggs testified that the Petitioner and Mr. Dean woke him up around 3:00 a.m. on February 14, 1998. (Id., p. 164.) Mr. Spriggs stated that Petitioner wanted to buy some drugs, but Mr. Spriggs

did not have any drugs to give Petitioner. (Id., p. 165.) Mr. Spriggs testified that Petitioner then asked to borrow some money, and "he would give me the gun and his car" to hold until Petitioner repaid the money the next day. (Id.) Mr. Spriggs stated he told Petitioner "Just give me your chain and I'll give you the money." (Id.) Mr. Spriggs testified that he loaned Petitioner $100. (Id.) Mr. Spriggs stated that Petitioner came to his house a second time that morning and "he told me that – that he had just wacked some people. And I was like, 'Whatever man.' He was like, 'You don't believe me.' He's like, 'You'll find out about it.'" (Id., p. 168.) Mr. Spriggs acknowledged that Petitioner "was acting kind of strange." (Id., p. 169.) Mr. Spriggs testified that Petitioner came to his house a third time on February 14, 1998, and Petitioner had brought a "12 pack of beer." (Id., p. 170.) Mr. Spriggs stated that when he walked into the kitchen, Petitioner "turned around and smacked" the Ruger 9mm in his hand. (Id.)

Brian Perdue testified that he was the neighbor and close friend to David and Jeanette. (Id., Exhibit 17, pp. 206 - 08.) Mr. Perdue testified that he was aware that Jeanette had a relationship with Petitioner because Jeanette had "told me in about 1989 or '90." (Id., p. 209.) Mr. Perdue stated that Jeanette and Petitioner would usually see one another once or twice a week by meeting at motels, Petitioner's house, or Jeanette's house. (Id., p. 211.) Mr. Perdue testified that Jeanette's relationship continued with Petitioner up until her death. (Id.) Mr. Perdue stated that Petitioner purchased a cell phone for Jeanette to use when she was traveling to Virginia to visit her sick father. (Id., p. 214.) Mr. Perdue testified Jeanette was discrete concerning her relationship with Petitioner and no one in Jeanette's family knew of her relationship with Petitioner. (Id., p. 217.) Mr. Perdue stated that Jeanette and Petitioner would usually meet after dark when David was at work and Martha was in bed. (Id., pp. 218 - 22.) Mr. Perdue testified that Jeanette and Petitioner's relationship "slowed down

a lot" after Martha moved in the house. (Id., p. 227.)

Johnny Williams testified that Petitioner is his brother. (Id., Exhibit 18, p. 6.) Mr. Williams stated that he had asked Petitioner several times if he was involved in the murders and Petitioner stated that "he'd never been involved in that." (Id., p. 8.) Mr. Williams stated that while Petitioner was hospitalized in Bluefield, he told Petitioner where the victim's bodies were discovered and that the Tech-9mm was found in the coke oven near Petitioner's property. (Id., p. 9.) Mr. Williams explained that he became aware of this information from rescue squad members. (Id., p. 10.) Mr. Williams testified that Chester Spriggs and Reggie Harriston had stole one of Petitioner's guns, but Chester later returned the gun to Petitioner. (Id., p. 12.) Mr. Williams testified that he was aware of Petitioner's relationship with Jeanette. (Id., p. 20.)

David Cooper testified that Petitioner is his brother. (Id., Exhibit 18, p. 24.) Mr. Cooper stated that Petitioner never told him that he had committed the murders. (Id., p. 25.) Mr. Cooper stated that Trooper VanMeter and Trooper Cochran questioned him concerning the Tech-9mm found in the coke oven near Petitioner's residence. (Id., p. 27.) Mr. Cooper further testified that Trooper Cochran accused him of putting the Tech-9mm in the coke oven. (Id., p. 28.) Mr. Cooper stated that he went to Petitioner's residence on February 18, 1998, to get a kerosene heater, microwave, and TV. (Id., pp. 35 - 36.) Mr. Cooper acknowledged that he was at Petitioner's residence the day before the Tech-9mm was discovered in the coke oven. (Id., p. 36.)

Judy Dale McDaniel testified that the victim, David Henderson, was her adopted brother. (Id., Exhibit 15, pp. 29 - 30.) Mrs. McDaniel stated that her parents bought the Henderson house in 1954. (Id., p. 30.) Mrs. McDaniel testified concerning the history of the house, which was built in the "late 1800's." (Id., p. 30 - 31.) Mrs. McDaniel stated that her step-father helped maintain the

house and had "polyurethane the whole house" in 1994 or 1995. (Id., p. 33.) Mrs. McDaniel stated that she became the owner of the house following her mother's death in 1995. (Id., pp. 32 - 33.) Mrs. McDaniel testified that since she was living in Florida, she asked David and his wife, Jeanette, to move into the house in 1995. (Id., p. 34.) Mrs. McDaniel stated that David worked as a custodian for Cole Motors in Bluefield, and Jeanette worked as a clerk at Kroger in Bluefield. (Id., p. 36.) Mrs. McDaniel stated that she was aware that Jeanette's mother, Martha Barber, moved into the house in 1997 because Jeanette's "father had died in November and her mother wasn't well." (Id., pp. 36-37.) Mrs. McDaniel stated Jeanette took a leave of absence from work to care for her mother. (Id., p. 37.) Mrs. McDaniel testified that she often visited David and Jeanette and that she knew their routine. (Id., p. 39.) Mrs. McDaniel stated that David would normally get home from work around 2:00 a.m, Jeanette and her mother would usually have a light breakfast around 8:00 a.m., and David would get up around 10:00 a.m and Jeanette would fix a "larger breakfast." (Id, p. 40 - 41.) Mrs. McDaniel testified that her husband had two children: Rodney Powell and Dana Martin. (Id., p. 45.) Mrs. McDaniel stated that the house was sold to Billy Cherry at a public auction on June 6, 1998. (Id., p. 66.)

Vera Rose testified that she is a contractor for Billy Cherry, the individual who purchased the Henderson house in June, 1998. (Exhibit 18, p. 42.) Ms. Rose stated that she has removed carpets, put paneling up, stuccoed the ceiling, painted, removed doors, fastened down the door facings, and done the lawn. (Id.) Ms. Rose testified the maids "put a type of wax down that was polyurethane in the hallways and in the bedrooms." (Id., pp. 59 and 61.) Ms. Rose testified that there have constantly been intruders in the Henderson house since it was purchased by Ms. Cherry. (Id., pp. 46 - 52.) Ms. Rose stated that she had not noticed that anything was taken or stolen, but it

appeared that the intruders were searching for something. (Id., pp. 51 - 52.)

## ANALYSIS

**A.    Error in Jury Composition**

**1.    Motion for Change of Venue:**

First, Petitioner alleges that the trial court erred in failing to grant a change in venue. (Document No. 1-2.) Specifically, Petitioner contends that the pretrial publicity in his case was "overly extensive, negative and prejudicial which prevented him from receiving a fair and impartial jury trial in McDowell County." (Id., p. 1.) Petitioner states that "[a] triple homicide investigation such as this in the small coal camp community of Switchback/Maybeury was front page news and the 'lead story' of the local television news stations, radio stations and newspaper publications in the tri-county and state area." (Id.) Petitioner additionally argues that he was prejudiced due to his interracial affair with one of the victims. (Id., p. 5.) Petitioner states that the jury was inflamed "due to the gossip and pretrial publicity about the interracial affair." (Id.) Thus, Petitioner claims that he "could not possibly be tried before a rural jury in the Bible Belt of West Virginia in an unbiased and fair fashion." (Id., p. 6.)

Respondent contends that "Petitioner has not proven that the jury pool was tainted by pre-trial publicity." (Document No. 37, p. 14.) Citing United States v. Stevens, 83 F.3d 60, 66 (2nd Cir. 1996), Respondent argues that "substantial publicity alone is not enough to require a change of venue." (Id.) Respondent contends that the mere exposure to the facts of the case does not justify a change of venue. (Id.) Respondent additionally notes that Petitioner withdrew his motion for change of venue after trial counsel hired an expert to conduct a change of venue study, which exhibited results favorable to Petitioner. (Id., p. 15.)

Under the Sixth and Fourteenth Amendments, a criminal defendant is guaranteed a trial by an unbiased jury. Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 551, 96 S.Ct. 2791, 2799, 49 L.Ed.2d 683 (1976); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). A change of venue is required as a matter of constitutional law only when the jury pool is tainted, "by so huge a wave of public passion" that the impaneling of an impartial jury is impossible. Mu'min v. Pruett, 125 F.3d 192, 199 (4th Cir. 1997). In determining whether a change of venue is warranted, the trial court should first determine "whether the publicity is so inherently prejudicial that trial proceedings must be presumed to be tainted," and if so, grant a change of venue prior to jury selection. United States v. Bakker, 925 F.2d 728, 732 (4th Cir. 1991). Prejudice, however, is presumed "only in extreme circumstances," such as where a confession is publicized. See Bakker, 925 F.2d at 732; Wells v. Murry, 831 F.2d 468, 472 (4th Cir. 1987). Absent extreme circumstances, the trial court should conduct *voir dire* to determine if actual prejudice exists. Bakker, 925 F.3d 732. In order to have a conviction overturned on grounds of adverse pretrial publicity, a person must demonstrate "an actual, identifiable prejudice attributable to that publicity on the part of members of his jury." Mayola v. State of Alabama, 623 F.2d 992, 996 (5th Cir. 1980), cert. denied, 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981). The undersigned notes that jurors are not required to be totally ignorant of the facts and issues involved in a case. Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1960). Specifically, the Irvin Court stated as follows:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread, and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely and of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere preconceived notion as to the prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence

presented in court.

Irvin, 366 U.S. at 722-23, 81 S.Ct. at 1642 - 43. In Sharder v. Riddle, the Western District of

Virginia stated that "one would expect that any resident of a sparsely populated area that reads the

newspapers is likely to hear of an incident of such impact as a murder, [but] [t]o require a change

of venue for this reason alone would be overly burdensome." Sharder v. Riddle, 401 F.Supp. 1345,

1348 (W.D.Va. 1975); also see United States v. Sawyers, 423 F.2d 1335 (4th Cir. 1970)(stating that

"[d]efendants were not entitled to change of venue for pretrial publicity, were publicity revealed

little more than what any prospective juror would learn when indictment was read, or opening

statements made.")

The undersigned first finds that Petitioner withdrew his Motion for Change of Venue in his

underlying criminal trial after trial counsel hired an expert to conduct a change of venue study,

which exhibited results favorable to Petitioner.[6] (Document No. 36, Exhibit 23, p. 32.) Moreover,

a thorough review of the trial transcripts reveals no evidence that the jury pool in the instant case

was tainted by "so huge a wave of public passion" that the impaneling of an impartial jury was not

possible. Despite Petitioner's claim that it was impossible to obtain an impartial jury in McDowell

---

[6] The following dialog occurred during the underlying criminal trial:

MR. HASSAN:    Yes, Your Honor. We have discussed that at length with Mr.
              Allen and at this time, we withdraw that motion for change of
              venue. We prefer to try the case here in McDowell County.

THE COURT:    Is that correct, Mr. Allen?

DEFENDANT:    Yes, sir.

(Document No. 36, Exhibit 23, p. 32.) Additionally, during Petitioner's State *habeas* proceeding trial
counsel testified that Petitioner did not wish to challenge venue. (*Id.*, Exhibit 13, pp. 106, 110, 141 -
42, 159 - 60, 202 - 03.)

County, there is no showing that the trial judge had any difficulty impaneling an unbiased jury. The selected jury panel indicated that they were capable of rendering an impartial verdict and requiring the State to meet its burden of proof. (Id., Exhibit 14, pp. 8 - 9, 26 - 30, 53 - 55, 72 - 73.) Specifically, the Court notes that only two jurors indicated that they read newspaper articles concerning the murders, and neither were prejudiced against Petitioner. Juror Curtis indicated that she believed that Petitioner was innocent based upon information she had read in the newspaper and because "it took too long for the State to come up with a case." (Id., 45 - 52.) Juror Richardson stated that he read a newspaper article "[j]ust right after the event was alleged to have happened," but this did not cause him to form an opinion concerning the case. (Id., p. 73.) The undersigned notes that the trial court refused to exclude either juror for cause because both jurors stated they could listen to the evidence and render a fair and unbiased decision based upon that evidence. (Id., pp. 50 and 73.) Thus, Petitioner fails to demonstrate that the jurors who presided over his case were actually biased or prejudiced against him as a result of any pretrial publicity. Accordingly, the undersigned recommends that Respondent be granted summary judgment as to the above claim.

    **2.    Impartial Jurors:**

    Next, Petitioner alleges that certain jurors should have been excluded from the jury. (Document No. 1-2.) Specifically, Petitioner states as follows: (1) Wanda Osborn was not impartial because Petitioner had numerous conversations with Juror Osborn at her place of employment, Morgan's Dairy Queen, and Petitioner had visited the home of Juror Osborne's daughter; (2) Jerry Dowson was not impartial because the prosecutor had represented Juror Dawson's son in a past misdemeanor case; (3) Larry Allen was "not impartial and he was a friend with assistant prosecuting attorney;" (4) Kathy Collins "was not impartial;" and (5) Laura Coleman was not impartial because

"she said that she would find the petitioner guilty no matter what the evidence was." (Id., pp. 2 - 3.)

The undersigned finds that the record fails to support Petitioner's claim that the above jurors were biased. "A trial judge's determination of potential juror bias ... is a factual finding entitled to the presumption of correctness contained in 28 U.S.C. § 2254(d)." Wainright v. Witt, 469 U.S. 412, 420, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Based upon a review of the record, the undersigned first finds that Juror Coleman was excused for cause following her statement that she did not feel she could render an unbiased decision due to her friendship with the victims' family. (Document No. 36, Exhibit 14, pp. 21 - 25.) Next, the undersigned notes that Jurors Osborne, Dawson, Allen, and Collins indicated that they could render a fair and unbiased decision based upon the evidence presented at trial. Specifically, Juror Osborne never indicated any bias against Petitioner and her name was mentioned only in passing in the trial transcripts. (Id., pp. 3 and 86.) Juror Dawson stated that the prosecutor, Mr. Bell, had "represented his son in school." (Id., p. 80.) Juror Allen indicated that she knew the assistant prosecutor, Ed Kornish, but she had never been represented by Mr. Kornish. (Id., p. 80.) Although Juror Collins stated that she recalled hearing something on the news "just in passing I just heard that there was a murder," she stated she had not formed an opinion as to Petitioner's guilt or innocence based upon the information she had heard. (Id., pp. 56 - 60.) Although Juror Richardson acknowledged that he used to ride to work with a friend who knew of the Petitioner, Juror Richardson stated that he had not formed an opinion concerning Petitioner's guilt or innocence. [7] (Id., pp. 64 - 77.) The undersigned notes that neither the State nor the defense

---

[7] Juror Richardson stated that he had worked with Larry Vaden, a possible witness, approximately eight months to a year prior to the trial. (Document No. 36, Exhibit 14, pp. 64, 69 - 70.) Juror Richardson stated that he used to ride to work with a friend who lived in the Barlow Hollow area, who knew the Petitioner "but not on a personal level," and his friend had merely told Juror Richardson that "he had heard that these three folks had been murdered and that an affair had

objected to Jurors Osborne, Dawson, Allen, Collins, and Richardson's inclusion on the jury panel. (Id., pp. 60, 77, 80, and 83.) In view of the foregoing, the undersigned finds that Petitioner has failed to demonstrate how the above jurors were biased against him such that the jurors should have been excluded from the jury panel. Accordingly, Respondents are entitled to summary judgment on the above claim.

### 3.   Claims of Violation of Batson:

Finally, Petitioner contends that the prosecutor improperly used one of his peremptory strikes to remove the only African-American remaining on the jury panel in violation of Batson v. Kentucky. (Document No. 1-2, p. 4.) Thus, Petitioner contends that the trial court erred in permitting the State to strike the only African-American juror. (Id.)

The United States Supreme Court has held that the "[p]urposeful racial discrimination in selection of venire violates the defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." Batson v. Kentucky, 476 U.S. 79, 86, 106 S.Ct. 1712, 90 L.Ed.2d. 69 (1986). To demonstrate purposeful racial discrimination under Batson, the defendant must show the following:

> The defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. The defendant may also rely on the fact that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of mind to discriminate. Finally, the defendant must show that such fact and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude the veniremen from the petit jury on account of their race. Once the defendant makes a prima facie showing, the burden shifts to the state to come forward with a neutral explanation for challenging black jurors. The prosecutor may no rebut a prima facie showing by stating that he challenged the jurors on the assumption that they would be partial to the defendant because of their

being going on between one of them and the defendant." (Id., p. 77.)

36

shared race or by affirming his good faith in individual selections.

Id., 476 U.S. at 80, 106 S.Ct. at 1714.

The record reveals that two Batson challenges were made in the underlying criminal trial.

First, Juror Craighead, an African American, was excused for cause during voir dire based upon her

admission that she had already formed an opinion that "I don't believe [Defendant] did it."

(Document No. 36, Exhibit 14, pp. 36 - 43.) Trial counsel raised a Batson challenge, and the Court

ruled as follows:

> Batson challenge to this juror based on this juror being a minority, not only as a
> female but more specifically as an African-American who is one of two African-
> Americans on the 20 who are under voir dire at this time. However, the Court feels
> that the State is making a legitimate ground to strike this juror for cause and,
> therefore, grants the motion. Moreover, the Court finds that although this juror being
> and African-American is being stricken for cause, that the entire panel of jurors for
> this case, there are still other African-Americans who may or may not be called to
> be voir dired in this case and the Court deems that the panel itself, the entire panel
> called in and, more specifically, African-Americans are concerned on this entire
> panel before this Court for this case at bar.

(Id., p. 43.) Second, the record reveals a Batson challenge was raised following the State's use of

a peremptory strike to remove Juror Curtis, an African-American. (Id., pp. 85, 92 - 94.) The State

offered the following reason for striking Juror Curtis:

> Your Honor, the State exercised one of its peremptory strikes to remove her from the
> panel based on her statements that she is a personal friend to the niece and nephew
> of the defendant and also that she had already formed an opinion as to what the
> verdict ought to be in the case. Those were the objective reasons we used.

(Id., p. 94.) The trial court found that the State set forth a race neutral reason for striking Juror

Curtis. Specifically, the trial court stated as follows:

> Well, the Court had the advantage of certainly hearing the statements by Ms. Curtis
> in the separate room when the first Batson challenge was raised and it is my
> recollection that she did say she knew, seems to me it was Chester Spriggs and
> someone else or a young lady who are related to the defendant, and also that she had

already made her mind up as to the verdict in this case. After further questioning by the Court, she did back off of that some and say that she thought that there was a possibility that her mind could be changed after hearing some evidence in the case. The Court respected that and allowed her to stay on the 20-member initial panel.

Based on all the facts and circumstances that the Court is aware of, as well as the representations made by this juror and looking at the totality of all of the circumstances, the Court does not find that any discrimination placed any part in the striking of this jury by the State of West Virginia and, therefore, although a Batson challenge was raised, the Court does not feel that it was a meritorious – the facts or the grounds were meritorious enough for the Court to grant the defendant's challenge as to this juror being stricken by the State using one of its peremptory challenges to strike this juror. The Court further feels that this juror was – that it was race neutral, there was no race discrimination here just because she is the same race of the defendant.

(Id., pp. 94 - 96.) Based on a thorough review of the record, the undersigned finds that Petitioner has failed to demonstrate that either Juror Craighead or Juror Curtis was removed from the jury based upon their race. Therefore, Respondent's Motion for Summary Judgment as to the above claim should be granted.

**B.**     **Ineffective Assistance of Counsel:**

*Habeas* petitions must meet heightened pleading requirements. McFarland v. Scott, 512 U.S. 849, 114 S.Ct. 2568, 129 L.Ed.2d 66 (1994). The petition must "set forth in summary form the facts supporting each of the grounds thus specified." Rule 2(c) of the Rules Governing Section 2254 Proceedings in the United States District Courts. "[N]otice pleading is not sufficient [in federal *habeas corpus*], for the petition is expected to state facts that point to a 'real possibility of constitutional error.'" Blackledge v. Allison, 431 U.S. 63, 75 n. 7, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977); also see Bernier v. Moore, 441 F.2d 395, 396 (1st Cir. 1971)(stating that "[t]he fundamental purpose of *habeas corpus* would be undermined if the writ were prostituted by holding it out as available upon mere 'notice' without any showing of entitlement.") The petitioner must come

38

forward with evidence that the claim has merit. Nickerson v. Lee, 971 F.2d 1125 (4th Cir. 1992), cert. denied, 507 U.S. 923, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993), *abrogation on other grounds recognized*, Yeatts v. Angelone, 166 F.3d 255 (4th Cir. 1999). Unsupported, conclusory allegations do not entitle a petitioner to relief. See Beasley v. Halland, 649 F.Supp. 561, 566 (S.D.W.Va. 1986)(finding that "[m]ere conclusory charges of perjury and the knowing use of perjured testimony is insufficient to warrant a hearing or habeas relief"); Jones v. Gomez, 66 F.3d 199, 204 - 05 (9th Cir. 1995)(stating that "[c]onclusory allegations which are not supported by a statement of specific facts do want warrant habeas relief").

In his Petition, Petitioner lists 41 grounds, and 24 sub-parts, in support of his claim of ineffective assistance of counsel. (Document No. 1-3, pp. 17 - 23.) The undersigned finds that only eight of these claims rise to the level of a properly plead claim: (1) Trial counsels' failure to object to Rule 404(b) evidence; (2) Trial counsels' failure to inspect the crime scene in a timely manner; (3) Trial counsels' failure to adequately advise Petitioner concerning his right to testify and prepare for trial; (4) Trial counsels' failure to have involuntary and incriminating statements excluded from evidence; (5) Trial counsels' failure to have the bullet identified as EV 1 examined by defense's ballistic expert; (6) Trial counsels' failure to seek a continuance in order to allow defense's DNA expert to testify at trial; (7) Trial counsels' failure to subpoena Dana Martin, Charlene Spriggs, and Verona Spriggs as witnesses; and (8) Trial counsel committed cumulative errors. In the remaining grounds, Petitioner merely sets forth a laundry list of mistakes allegedly committed by trial counsel without setting forth any analysis or explanation as to why counsel should have taken certain acts or how Petitioner was prejudice by such failure. Therefore, the undersigned will address only the eight grounds set forth above.

The standards established by the United States Supreme Court in determining whether or not a defendant was denied his Sixth Amendment right to effective assistance of counsel are set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ineffective assistance of counsel claims consist of mixed questions of fact and law. Id. Under the two-pronged standard, a Petitioner must show (1) that counsel's performance was so deficient that it fell below an objective standard of reasonableness, and (2) that counsel's deficiency resulted in prejudice so as to render the results of the trial unreliable. Id. at 687-91, 104 S.Ct. at 2064-66. Counsel's performance is entitled to a presumption of reasonableness and judicial review of counsel's strategic decisions is highly deferential. Id. at 689, 104 S.Ct. at 2065. Thus, a petitioner challenging his conviction on the grounds of ineffective assistance must overcome a strong presumption that the challenged actions constituted sound trial strategies. Id. The Court in Strickland cautioned against the ease in second-guessing counsel's unsuccessful assistance after the adverse conviction and sentence are entered. Id. The Fourth Circuit Court of Appeals specifically recognized that ineffective assistance of counsel may not be established by a "Monday morning quarterbacking" review of counsel's choice of trial strategy. Stamper v. Muncie, 944 F.2d 170, 178 (4th Cir. 1991), cert. denied, 506 U.S. 1087 (1993). Applying this standard, and based upon all of the evidence of record, the Court will address the merits of each of Petitioner's allegations of ineffective assistance of counsel as set forth above.

## 1.    Trial counsels' failure to object to Rule 404(b) evidence.

Petitioner first alleges that "counsel failed to properly represent petitioner during the *in camera* hearing in regards to whether or not the trial court could allow the admission of evidence of collateral crimes as contemplated by Rule 404." (Document No. 1-3, p. 4.) Petitioner claims "that

evidence of collateral crimes is admissible only if it satisfies Rule 404, establishing the elements of motive, intent, the absence of mistake or accident, or a common scheme or plan embracing crimes so related to each other that proof of one tends to establish the other." (Id.) Thus, Petitioner argues that "trail counsel failed to make the correct decision during the *in camera* hearing because petitioner's counsel failed to properly compel the court to rule the evidence concerning incidents involving the petitioner is inadmissible." (Id.)

Respondent argues that Petitioner's above claim that trial counsel failed to request an *in camera* hearing to test the admissibility of certain 404(b) evidence must be dismissed. (Document No. 37, p. 23.) Specifically, Respondent contends that Petitioner's failure to specify the prior bad act evidence that was improperly introduced at trial is fatal to Petitioner's claim. (Id., pp. 23 - 24.) Respondent further states that Petitioner's "claim that defense counsel overlooked this issue is not supported by the record." (Id., p. 23.) Finally, Respondent asserts that Petitioner failed to properly exhaust the above claim because it was not raised in Petitioner's amended petition nor was it raised in Petitioner's State *habeas* appeal. (Id., p. 24.)

After reviewing the record, the undersigned finds that Petitioner failed to properly exhaust his claim that his trial counsel failed to properly challenge Rule 404(b) evidence.[8] Based upon a

---

[8] Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 [AEDPA], effective April 24, 1996, State prisoners must exhaust available State remedies prior to filing a § 2254 petition in federal Court. 28 U.S.C. § 2254(b)(1)(A); *see also*, *McDaniel v. Holland*, 631 F.Supp. 1544, 1545 (S.D.W.Va. 1986)("A federal court will not entertain a state prisoner's petition for a writ of habeas corpus unless the prisoner has first exhausted available state judicial remedies."). Section 2254(b)(1)'s exhaustion requirement can be satisfied in either one of two ways: (1) the Petitioner can fairly present all claims in State Court, or (2) the Petitioner's claims will be deemed exhausted if no State remedies are currently available. *See Gray v. Netherland*, 518 U.S. 152, 161, 116 S.Ct. 2074, 2080, 135 L.Ed.2d 457 (1996). Fair presentation requires the Petitioner to (1) present the same claims (2) to all appropriate State Courts. *See Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997). Presentation of the same claim "contemplates

thorough review of the record, it appears that Petitioner failed to raise the above issue in the following: (1) direct appeal, filed by counsel (Document No. 14-2, Exhibit 4.); (2) Amended Petition for Writ of *Habeas Corpus*, filed by counsel (Document No. 14-4, Exhibit 7.); or (3) Petition for Appeal from the Denial of Writ of Habeas Corpus, filed by counsel (Document No. 14-5, Exhibit 9). Although Petitioner raised the above issue in his initial *pro se* petition for *habeas* relief filed with the Circuit Court of McDowell County (Document No. 14-3, Exhibit 6.), Petitioner omitted the issue in all subsequent filings. Petitioner's claim that trial counsel acted ineffectively by failing to challenge Rule 404(b) evidence was never presented to the State's highest Court on either direct or collateral review. Thus, the State Courts were not afforded "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." See O'Sullivan, 526 U.S. at 845, 119 S.Ct. at 1732. Clearly, Petitioner had the opportunity to the raise the above issue in his State proceedings, but failed to do so. (Document No. 14-2, Exhibit 4, Document No. 14-4, Exhibit 7, Document No. 14-5, Exhibit 9.) Furthermore, Petitioner has not indicated, nor does the record suggest, any circumstance which hindered or impeded him from raising the aforesaid issue. Petitioner was represented and his requests for review of his conviction and sentence and the Circuit Court's denial of his Petition for *habeas* relief were submitted by counsel. The aforesaid issue must therefore be deemed procedurally defaulted or

---

that 'both the operative facts and the 'controlling legal principles'' must be presented to the state court." *Id.* (*quoting Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992) (*quoting Picard v. Connor*, 404 U.S. 270, 277, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971)). The requirement of presentation of the same claim to all appropriate State Courts is designed to give "the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999). This requirement is satisfied by presentation to the State's highest Court on either direct or collateral review. *See O'Sullivan*, 526 U.S. at 844, 119 S.Ct. at 1732.

unexhausted and not properly before the District Court in this matter.[9]

## 2. Trial counsels' failure to properly investigate the crime scene.

Petitioner claims that trial counsel failed to "motion the trial court in a timely manner to inspect the alleged crime scene to determine any probable defense tactics surrounding the state's investigation of the alleged crime in this case." (Document No. 1-3, p. 4.) In response, Respondent argues that there is no evidence to support Petitioner's claim that trial counsel failed to properly investigate the crime scene. (Document No. 37, pp. 24 - 26.) Respondent contends that defense counsel visited the crime scene more than once with the presence of experts to investigate and collect evidence. (Id.) Respondent asserts that the above claim should be dismissed because "Petitioner fails to specify how counsel's conduct was unreasonable or resulted in prejudice." (Id., pp. 25 - 26.)

Trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct. at 2066. When trial counsel did not make an investigation, his decision "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. In determining the reasonableness of counsel's actions, consideration may be given to "the defendant's own statements or actions." Id.

During the omnibus hearing, Mr. Vaughn, Mr. Flitchum, Mr. Hassan, and Trooper Bishop testified concerning the length of time between the murders and trial counsels' investigation of the crime scene. (Document No. 36, Exhibit 13.) Mr. Vaughn testified that he viewed the crime scene

---

[9]  The undersigned finds that even assuming the above claim to be properly exhausted, Petitioner fails to properly allege what evidence was introduced under Rule 404(b), and how that evidence  resulted in prejudice.

with trial counsel and police officers "several months [after] the attorney had the case." (Id., pp. 48 -
49.) Mr. Vaughn indicated that he had no reason to believe the crime scene had been altered at the
time of his investigation. (Id., p. 54.) Trooper Bishop testified that he could not recall if the crime
scene had been released at the time of trial counsels' visits, but the crime scene was secured until
officers were certain that all evidence was removed. (Id., pp. 81 - 82.) Mr. Flitchum stated that he
visited the crime scene more than once and believed the crime scene was secured. (Id., pp. 117, 125,
135-36.) Mr. Hassan testified that visited the crime scene on two occasions. (Id., pp.184.)

During the criminal trial, Trooper Bishop testified that Mr. Flitchum, Mr. Hassan, Mr. Bell,
and Mr. Vaughn visited the crime scene on March 8, 1998. (Id., Exhibit 15, pp. 205 - 06, 245.)
Trooper Bishop stated that the crime scene visit took place "shortly after the offense occurred" and
he "believe[d] it was still taped up." (Id.) Mr. Vaughn testified during trial that he did not recall the
exact dates he visited the crime scene, but "I was up there twice." (Id., Exhibit 18, pp. 65 - 67.) Mr.
Vaughn acknowledged that his first visit occurred approximately three weeks after the murders. (Id.,
p. 82.) Mr. Vaughn indicated that Mr. Hassan, Mr. Flitchum, Mr. White, and Ms. Rose were present
at the crime scene during his second visit. (Id., p. 67.) Mr. White also testified that he visited the
crime scene with Mr. Flitchum, Mr. Vaughn, and Ms. Rose on November 14, 1998. (Id., Exhibit 17,
pp. 283 - 84, 300 - 01.)

Without determining whether trial counsel's performance was deficient, the undersigned
finds that Petitioner has not demonstrated that he was prejudiced by trial counsels' failure to timely
investigate the crime scene. Petitioner merely makes a generalized claim that trial counsel was
ineffective in failing to timely investigate the crime scene. The undersigned has conducted a
thorough review of the omnibus hearing and trial transcripts, which indicates that trial counsel

conducted two investigations at the crime scene: first, approximately three after the murders, and second, approximately nine months after the murders. Specifically, trial counsel viewed the crime scene with Mr. Vaughn approximately three weeks after the murders, and visited the crime scene again with Mr. White and Mr. Vaughn approximately nine months after the murders. (Document No. 36, Exhibit 13, pp. 48 - 50, 54, 117, 125, 135 - 36, 185, Exhibit 15, pp. 205 - 06, 245, Exhibit 17, pp. 283 - 84, 300 - 01, and Exhibit 18, pp. 65 - 67, 82.) There is no evidence that trial counsel failed to obtain exculpatory evidence due to their failure to conduct an earlier investigation of the crime scene. The record reveals that Mr. Vaughn inspected the crime scene for potential gunshot angles and recovered a bullet from the wall, and Mr. White collected approximately 34 blood samples during his visit. (Id., Exhibit 13, pp. 49 - 50 and Exhibit 17, p. 284.) Thus, Petitioner fails to demonstrate what the result of an early investigation would have revealed, and how it would have altered the outcome of the verdict. See Bassette v. Thompson, 915 F.2d 932, 940 - 41 (4th Cir. 1990)(an allegation that an attorney conducted an inadequate investigation does not warrant relief absent a proffer of the specific favorable evidence the investigation would have brought out). Accordingly, Respondent is entitled to summary judgment because Petitioner fails to demonstrate how he was prejudiced by trial counsels' failure to conduct an earlier investigation of the crime scene.

### 3.    Trial counsels' failure to advise Petitioner of rights and prepare him for trial.

Petitioner alleges that "[c]ounsel failed to properly investigate the case to provide all the information to petitioner for the sole purpose of making an informed decision to proceed to certain defense tactics and whether or not to testify if this case proceeded to trial and to aid him in making informed decisions."(Document No. 1-3, p. 5.) Specifically, Petitioner alleges that "attorney client

communication was barely existent." (Id., p. 16.) Petitioner further complains that "counsel's lack of preparation was obvious and fumbling around was enough to put doubt into any client's mind." (Id., p. 5.) In response, Respondent asserts that Petitioner fails to "specify what 'information' he is talking about, or how this information could undermine confidence in the verdict." (Document No. 37, p. 26.) Respondent argues that there is no evidence to support Petitioner's claim that defense counsel failed to inform him of his rights or prepare him to testify. (Id.) Specifically, Respondent contends that Petitioner "conceded that the decision to testify was his, and that he was not forced, coerced or tricked by his attorneys." (Id.) Finally, Respondent notes that Mr. Hassan "described Petitioner as uncooperative; that, on occasion he would refuse to provide answers to their questions, suggesting that they talk to certain witnesses. These suggestions only succeeded in leading counsel on wild goose chases." (Id.)

The undersigned finds that Petitioner's claim that trial counsel failed to adequately advise Petitioner of his rights and prepare him for trial to be without merit. First, Petitioner alleges that the attorney-client relationship broken down and that counsel visited Petitioner only three times prior to trial. Although Petitioner alleges that the attorney-client relationship broke down prior to trial, Mr. Hassan testified that he extensively spoke with Petitioner regarding his case during the seventeen months leading up to the trial. (Document No. 36, Exhibit 13, p. 142.) Moreover, the "[i]nfrequency of visitation is not alone enough to demonstrate ineffective assistance of counsel." Brinkley v. Lefevre, 621 F.2d 45, 46 (2nd Cir. 1980); Caldwell v. United States, 651 F.2d 429, 432 (6th Cir. 1981). Mr. Hassan further stated that he attempted to speak to several witnesses suggested by Petitioner, but the witnesses were uncooperative. (Id., pp. 165, 176 - 77, 196.) Mr. Hassan testified that he explained to Petitioner his right to testify, and Petitioner indicated that he wanted

to testify at trial. (<u>Id.</u>, p. 157.) Mr. Hassan also stated that he believed it was necessary for Petitioner to testify as a tactical matter in order to rebut his many confessions. (<u>Id.</u>, p. 158.) Petitioner acknowledged that it was his decision to testify, and that he was not forced or tricked by his attorneys. (<u>Id.</u>, pp. 227 - 28, 264.) A review of the trial transcripts reveals that the trial court advised Petitioner of his rights prior to Petitioner's testimony, and Petitioner acknowledged that he understood those rights. (<u>Id.</u>, Exhibit 17, pp. 247 - 49.) Prior to Petitioner taking the stand, counsel again discussed and advised Petitioner of his right to testify. (<u>Id.</u>, Exhibit 18, pp. 89 - 90.) Based on the foregoing, the undersigned finds that Respondent is entitled to summary judgment on Petitioner's claim that counsel failed to adequately advise Petitioner of his rights and prepare him for trial.

### 4. Trial counsels' failure to have involuntary statements excluded from evidence.

Petitioner alleges that trial counsel acted ineffectively by failing to have Petitioner's involuntary and incriminating statements excluded from evidence. (Document No. 1-3, p. 16.) Specifically, Petitioner alleges that "there is a complete absence of any motions on record by defense counsel that relates to the issue" of the voluntariness of Petitioner's incriminating statements. (<u>Id.</u>) Petitioner further indicates that trial counsel failed to raise the issue of whether officers were prohibited from eliciting statements from Petitioner because his Sixth Amendment right to counsel had attached prior to his confessions. (Document No. 39-3, pp. 24 - 30.) Specifically, Petitioner contends that his Sixth Amendment right to counsel attached when he was arrested in Richmond, Virginia, and not when he was presented before the magistrate judge in McDowell County, West Virginia. (<u>Id.</u>, pp. 25 - 27.) Thus, Petitioner contends that his Sixth Amendment right to counsel attached in Richmond, Virginia, and any statement given by Petitioner after this point should have

been excluded. (Id.)

Respondent first argues that Petitioner is incorrect in his assertion that trial counsel failed to file any motions seeking to suppress Petitioner's incriminating statements. (Document No. 37, pp. 33 - 36.) Next, Respondent states that "deciding how to argue a motion to suppress is a prime example of trial strategy [and] "[t]hese strategic choices are unreviewable unless there is evidence that counsel utterly failed to consider a viable course of conduct." (Id., p. 33.) Respondent contends that there is no evidence to suggest that trial counsel failed to consider Petitioner's right to counsel argument. (Id.) Respondent further claims that Petitioner's right to counsel argument was frivolous because the right to counsel under West Virginia law does not attach until "the initiation of judicial proceedings by way of formal charges, preliminary hearing, indictment, information, or arraignment." (Id.) Respondent points out that "the State did not take any of Petitioner's statements after he appeared before the magistrate" and trial counsel no duty to argue frivolous claims. (Id., p. 35.)

The undersigned first finds that Petitioner's claim that trial counsel failed to file any motions concerning the involuntariness of his statements to be without merit. The trial transcripts clearly reveal that trial counsel filed a Motion to Suppress concerning Petitioner's confessions. (Document No. 36-32, Exhibit 22.) During the motion to suppress hearing, extensive testimony was taken from the following individuals: Trooper Bishop (Document No. 36-21, Exhibit 22, pp. 6 - 86.); Trooper VanMeter (Id., pp. 86 - 102); Tooper Cochran (Id., pp. 102 - 108, and Document No. 36 - 22, Exhibit 22, pp. 1 - 33.); and Petitioner (Document No. 36-22, Exhibit 22, pp. 36 - 78). The trial court then ruled as follows:

> The Court feels, after looking at the totality of all the circumstances and hearing the testimony of the police officers and the defendant, that the State has met its burden

48

of proof here by a preponderance of the evidence that the defendant's statements, either oral or in writing, were voluntary statements, notwithstanding the fact that the defendant maintains he was threatened, coerced or threatened by gunpoint. The Court is not persuaded of those things and maintains that the State has met its burden of proof.

(Id., p. 88.)

Next, the undersigned find that Petitioner was not prejudiced by trial counsels' failure to seek the exclusion of Petitioner's confession based upon the alleged violation of his Sixth Amendment right to counsel because the issue lacked merit. An individual's Sixth Amendment right to counsel "attaches only at or after the initiation of adversary judicial proceedings against the defendant." United States v. Gouveia, 467 U.S. 180, 187, 104, S.Ct. 2292, 81 L.Ed.2d 146 (1984); see also McNeil v. Wisconsin, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)(stating that a defendant's Sixth Amendment right to counsel attaches at the initiation of adversary judicial proceedings). Under West Virginia law, "the Sixth Amendment right to counsel attaches at the time judicial proceedings have been initiated against a defendant whether by way of formal charges, preliminary hearing, indictment, information, or arraignment." Syllabus point 1, State v. Bowyer, 181 W.Va. 26, 380 S.E.2d 193 (1989); also see State ex. rel. Sims v. Perry, 204 W.Va. 625, 515 S.E.2d 582 (1999); Rinehart v. Boles, 286 F. Supp. 562, 563 (N.D.W.Va. 1968)(holding that "the right to counsel does not attach at a preliminary hearing under West Virginia law since this proceeding is not critical stage of the criminal process"). Once the right to counsel attaches, officers may not deliberately elicit incriminating statements from a defendant outside the presence of counsel unless the defendant has waived his right to counsel. Fellers v. United States, 540 U.S. 519, 523 - 24, 124 S.Ct. 1019, 1022, 157 L.Ed.2d 1016 (2004). Based upon a review of the record, the undersigned finds that Petitioner's Sixth Amendment right to counsel did not attach at time of his

arrest in Richmond, Virginia, which was prior to his presentment before the magistrate judge in McDowell County, West Virginia. See United States v. Alvardo, 440 F.3d 191, 200 (4th Cir. 2006)("the Sixth Amendment right to counsel does not attach immediately after arrest and prior to arraignment"); Gouveia, 467 U.S. at 190, 104 S.Ct. at 2292("[W]e have never held that the right to counsel attaches at the time of arrest"). Further, Petitioner was clearly advised of his Miranda rights following his arrest in Richmond, Virginia, and there is no evidence that Petitioner ever requested the assistance of counsel prior to his presentment in magistrate court. The undersigned, therefore, finds that Petitioner was not prejudiced by trial counsels' failure to present a non-meritorious argument during the motion to suppress hearing, and Respondent should be granted summary judgment.

### 5. Trial counsels' failure to test bullet identified as EV 1.

Petitioner contends that trial counsel acted ineffectively by failing to have Mr. Brundage, the ballistics expert, examine the bullet identified as EV 1. (Document No. 1-3, p. 16.) Specifically, Petitioner states that his ballistics expert "was never given the opportunity to examine the State's most valuable piece of evidence against the Appellant, a bullet taken from the body of Jeannette Henderson, which the State claimed matched a gun owned by the Appellant." (Id.) In response, Respondent contends that Petitioner waived the above claim during the criminal trial because Petitioner withdrew his motion to exclude the EV 1 bullet. (Document No. 37, pp. 29 - 30.) Respondent further argues that there is no evidence that Petitioner was prejudiced by counsels' failure to have the bullet independently examined. (Id., p. 30.) Specifically, Respondent states that "Petitioner has never proven that an independent examination of the bullet would have undermined Trooper Lane's testimony." (Id.) Finally, Respondent claims that trial counsel acted strategically

because "reasonably counsel might have believed that drawing the jury's attention to the State's failure to produce the bullet for independent analysis might have been more effective than actually conducting the test." (Id.) The State *habeas* court found that the above allegations of error were issues of strategical decision, which were not a proper basis for *habeas* relief. (Document No. 14, Exhibit 8, pp. 8 - 10.)

A review of the trial transcripts reveal that Trooper Lane testified that Trooper Bishop, the investigating officer, delivered a Ruger 9mm and Tech-9mm to him for testing. (Document No. 36, Exhibit 15, pp. 23 and 27.) Trooper Lane also received from Dr. Kaplan a 9mm bullet identified as EV 1, which was recovered from Jeanette's body. (Id., Exhibit 17, p. 31.) Based upon Trooper Lane's testing, he testified that the 9mm bullet removed from Jeanette's body was fired from the Ruger 9mm that was recovered from Petitioner's residence. (Id., p. 32.) Trial counsel retained Mr. Brundage, a forensic analyst from the CIB Bureau in Marion County, Indiana, to act as Petitioner's ballistics expert. The bullet identified as EV 1 was omitted from the evidence sent to Mr. Brundage for independent testing. Based upon this omission, trail counsel made a motion to exclude the bullet identified as EV 1 from evidence. (Id., Exhibit 15, p. 249.) Trial counsel admitted that they knew the night before the trial began that the EV 1 bullet had been omitted from the evidence, but waited until the second day of trial to file its motion to exclude. (Id., Exhibit 15, pp. 260 - 63.) The State objected to the motion to exclude, and the trial court suggested a continuance of the trial until the EV 1 bullet could be examined by Mr. Brundage. Trial counsel and Petitioner, however, stated that they did not wish to continue the trial in order to allow the independent testing by Mr. Brundage. (Id., Exhibit 15, pp. 274 - 85.) The trial court then thoroughly advised Petitioner of the consequence of withdrawing his motion and proceeding with the trial. (Id., pp. 278 - 88.) The following dialog

occurred between the trial court and Petitioner:

THE COURT:     If you withdraw your objection now to that, - - and I'm not saying the jury's going to do this, but let's assume they do this, okay? Let's assume they would find you guilty - - and I'm not calling - - I'm not making that judgment. This is just for purposes of me explaining this to you. Do you understand that?

DEFENDANT:     Yes.

THE COURT:     You following me so far?

DEFENDANT:     Yes.

THE COURT:     Let's assume the jury would find you guilty on these charges. You would have the right to an appeal - - - an automatic appeal to the West Virginia Supreme Court of Appeals because you had a jury trial. Anybody who has a jury trial and is found guilty - - or receives an adverse decision has an automatic right to appeal it. Do you understand that?

DEFENDANT:     Yes, sir. I want to consult with my counsel.

THE COURT:     Well, let me finish because when you consult with them, I want you to fully understand what's going on.

When you appeal, if you have to, I'm simply saying you might raise this objection on appeal, but I doubt if our Supreme Court would look at this objection because you've withdrawn it. Do you understand that? Are you still with me?

DEFENDANT:     Still with you.

THE COURT:     Then let's go a step further and assume, for purposes of me explaining this to you, that the Supreme Court would affirm your convictions. In other words, they would say that the jury made the right decision and that's going to stand. Are you still with me?

DEFENDANT:     Yes.

THE COURT:     Then you would have the right to file what's called a writ of habeas corpus which would indicate that you're being held

illegally and your constitutional rights were violated somewhere back either in the trial stage or even before. And you would raise in that writ of habeas corpus as one of your grounds that, the State withheld evidence from you and your expert wasn't allowed to examine it after the Court had ordered it be examined by your expert.

I'm simply saying to you that if you withdraw your objection here today, you can raise that ground in your writ of habeas corpus, but you would - - in all likelihood you probably would not be successful. Okay. Are you still with me?

DEFENDANT:     Still with you.

THE COURT:     So that's the reason I want you to be clear on this. And if you decided you want to withdraw your objection, that's fine with me and we'll continue on with the trial. However, the State now has suggested to the Court that they would like to continue this case. They will turn over this projectile immediately to your expert to examine, and I'm going to order him to have it done within a week and we'd come back here after he's done what he needs to do to it. We come back here and we go on forward with the trial. In other words, we don't just keep going today or tomorrow. We give your man time to look at it.

Now, you need to go talk with your lawyers again. I want you to explain to him the same thing I just explained to him and then come back and tell me what you want to do. Okay.

Now, have I confused you? Or are you pretty clear on what I've said.

DEFENDANT:     I'm pretty clear.

THE COURT:     All right. Now, take five minutes. Don't take more than that. Now, we've wrestled with this. Take five minutes and then come back.

THE COURT:     Mr. Allen, have you had an opportunity to discuss this with your lawyers and reach a decision?

DEFENDANT:     Yes. I want to trial to go forward.

53

| THE COURT: | You want to continue now? |
|---|---|
| DEFENDANT: | Yes. |
| THE COURT: | And you fully understand everything I talked to you about? |
| DEFENDANT: | Yes. |
| THE COURT: | Did you lawyer explain the same thing to you in a way that you could understand it? |
| DEFENDANT: | Yes, sir. |
| THE COURT: | So you wish to withdraw your objection to the entry of this evidence - - to the State being precluded from having their witness testify to this? |
| DEFENDANT: | Yes, sir. |

(Id., pp. 278 - 82.)

The undersigned finds that Petitioner has failed to provide any evidence rebutting the State *habeas* court's findings of fact and conclusions of law, which are presumptively correct. The State *habeas* court properly applied the standards set forth in Strickland in its determination that counsel was not ineffective. Whether to admit or object to evidence, move for a mistrial, and request a cautionary instruction are questions of strategy for trial counsel. An attorney's strategic decision is presumed reasonable and protected from second guessing under Strickland. Trial counsel decided to present evidence refuting the creditability of the State's experts by emphasizing that the EV 1 bullet was omitted from the evidence sent for independent testing. (Document No. 36, Exhibit 13, p. 156, and Exhibit 18, p. 276.) Petitioner has failed to show how counsels' failure to have the EV 1 bullet independently tested resulted in prejudice. There is no evidence discrediting the results of the ballistics testing of the EV 1 bullet conducted by the State. The evidence clearly reveals that the EV 1 bullet was a 9mm, and numerous 9mm bullets and shell casings were recovered from the crime

scene. Although trial counsel was aware just prior to trial that the EV 1 bullet had been omitted from the evidence sent to Mr. Brundage for independent testing, trial counsel tactically delayed revealing the omission in hopes that the evidence would be excluded. Trial counsel and Petitioner then chose to withdraw their objection to the admission of the EV 1 bullet, and to emphasize that the State omitted the EV 1 bullet from the evidence sent to defense's independent expert.[10] Petitioner's assertion that his trial counsel was ineffective in proceeding in this manner amounts to nothing more than second guessing. While other attorneys may have approached the issue differently, Petitioner's trial counsel decided to present the evidence as they did. The undersigned finds that Petitioner fails to establish either that counsels' performance fell below the objective standard of reasonableness or that counsels' conduct prejudiced him such that he was denied a fair trial. Accordingly, Petitioner has failed to establish either prong of the <u>Strickland</u> analysis and therefore, Respondent is entitled to summary judgment on this claim.

### 6.    Trial counsels' failure to have DNA expert testify at trial.

Petitioner argues that trial counsel was ineffective in their failure to seek a continuance in order to allow defense's DNA expert, Anita Matthews, to testify at trial. (Document No. 1-3, pp. 16 - 17.) Specifically, Petitioner states that if the "DNA expert had appeared at trial and had been given a chance to testify before and about her findings, the jury may have heard once again about discrepancies that the blood found inside the barrel of the gun owned by the Appellant was not that of Martha Barber, Jeanette Henderson's mother." (<u>Id.</u>, p. 17.) In response, Respondent asserts that trial counsel "conducted a reasonable investigation, obtained the services of an expert, and presented

---

[10]  Mr. Brundage testified that the bullet identified as EV 1 was omitted from the evidence submitted to him for testing. (Document No. 36, Exhibit 17, p. 256.)

her findings without having to call her as a witness." (Document No. 37, p. 32.) Specifically, Respondent states that "defense counsel got Trooper Myers to testify that he had no problems with the findings in Ms. Matthews' report, that he did not dispute her work, and that LabCorp had a reputation for going good work." (Id.) Thus, Respondent contends that "defense was able to bolster their own expert's findings by using testimony from the State's expert, without exposing her to cross examination." (Id.) The State *habeas* court found that the above allegation of error was an issue of strategical decision, which was not a proper basis for *habeas* relief. (Document No. 14, Exhibit 8, pp. 8 - 10.)

Petitioner has failed to provide any evidence rebutting the State *habeas* court's findings of fact and conclusions of law, which are presumptively correct. Petitioner fails to establish that prejudice resulted from trial counsels' failure to seek a continuance in order to allow Ms. Matthews to testify in person concerning her test results. The transcripts of Petitioner's criminal trial reveals that Ms. Matthews could not appear at trial due to adverse weather conditions and the parties agreed to stipulate Ms. Matthews' report into evidence.[11] (Document No. 36, Exhibit 13, p. 133 and Exhibit 17, pp. 10 and 140.) During the omnibus hearing, trial counsel testified that Ms. Matthews' test results were consistent with the State's findings. (Exhibit 13, p. 123, 134 - 35.) Specifically, Mr. Flinchum testified that Ms. Matthews' findings "would have backed up the State's evidence, and so, when she didn't appear in court, we - - she would have not been beneficial to our defense." (Id., p. 134.) The record reveals that Ms. Matthews' report clearly indicated that the blood recovered

---

[11] Ms. Matthews was detained in North Carolina because of a hurricane, and it would have been more than week before she could travel to West Virginia. (Document No. 36, Exhibit 17, pp. 10 and 140.) The trial court inquired whether Petitioner agreed that Ms. Matthew's report to be stipulated into evidence, and stated "Yes, sir. I understand." (*Id.*, p. 140.)

from inside the barrel of the Tech-9mm matched Martha's blood.[12] Furthermore, defense counsel

used Ms. Matthews' report to cross-examine the State's expert witness. (Id., Exhibit 17, p. 185.)

Specifically, the State's expert did not dispute Ms. Matthews' findings that a blood sample removed

from under the polyurethane on the hardwood floor did not match the blood of any of the victims

or Petitioner.[13] (Id., Exhibit 13, pp. 186, 206 - 08 and Exhibit 17, pp. 185, 189 - 90.) Thus, Petitioner

has failed to establish how he was prejudiced by counsels' failure to seek a continuance in order to

allow Ms. Matthews to testify in person. Clearly, Ms. Matthews' report exhibited that Martha's

blood was found inside the barrel of Petitioner's Tech-9mm and there is no reason to speculate that

Ms. Matthews would have testified differently had she been present in court. Accordingly, without

determining whether counsel's performance was deficient under the first prong of the Strickland

analysis, the undersigned finds that Petitioner has not established prejudice under the second prong

and therefore, is not entitled to relief on these grounds.

### 7.    Trial counsels' failure to subpoena witnesses.

Petitioner alleges that trial counsel acted ineffectively by failing to subpoena Dana Martin,

Charlene Spriggs, and Verona Spriggs as witnesses. (Document No. 1-3, p. 14.) Petitioner alleges

that the above witnesses should have been subpoenaed because (1) trial counsel believed Dana

Martin was the "actual triggerman," and (2) Charlene and Verona Spriggs would have testified that

guns had been stolen from Petitioner's house. (Id.) In response, Respondent argues that trial

---

[12]  Trooper Myers testified as follows: "From the Tech-9, the blood I identified from that human DNA was consistent with Ms. Barber, from the 50 round magazine, also consistent with Ms. Barber, and the carrying case was also consistent with Ms. Barber." (Document No. 36, Exhibit 17, p. 166.)

[13]  Trooper Myers testified that "I have no reason to doubt Lab Corps results. I know their work and they do very good work." (Document No. 36, Exhibit 17, p. 190.)

counsels' decision as to who to subpoena as a witness was clearly a tactically decision, and there is no evidence that Petitioner was prejudiced by his decision. (Document No. 37, pp. 36 - 37, 39 - 40.) The State *habeas* court found that the above allegations of error were issues of strategical decision, which were not a proper basis for *habeas* relief. (Document No. 14, Exhibit 8, pp. 8 - 10.)

Without determining whether trial counsel's performance was deficient, the undersigned agrees with the State *habeas* court and finds that Petitioner has not demonstrated that he was prejudiced by counsel's failure to procure Dana Martin, Charlene Spriggs, and Verona Spriggs as witnesses. First, the undersigned finds that trial counsel was not ineffective in failing to call Mr. Martin as a witness. Mr. Hassan testified during the omnibus hearing that he did not recall Petitioner requesting that Dana Martin be called as a witness. (Exhibit 13, p. 176.) Although Mr. Hassan admitted that it was defense's theory that Mr. Martin was involved in the murders, Mr. Hassan chose not to subpoena Mr. Martin as a witness. (Id., pp. 174 - 75.) Mr. Hassan testified that their strategy was focused on deflecting suspicion from Petitioner to a third party. (Id.) Although Petitioner alleges that Mr. Martin should have been called as a witness in support of this strategy, the record reveals that Petitioner testified at trial concerning his theory. (Id., p. 239.) The trial transcripts reveal that Petitioner testified that he believed the victims were killed because of their involvement in the drug cartel and he was being framed by Mr. Martin, Chester Spriggs, Mark Dean, Michael Spriggs, and Joe Steele. (Id., pp. 145 - 46, 256 - 57.) Specifically, Petitioner testified that he believed Mr. Martin had Jeanette killed because Jeanette was the bookkeeper for the drug cartel and she was trying to end her involvement with the cartel. (Id., p. 143 - 45.) Petitioner further testified concerning his allegation that guns were stolen from his residence prior to the murders and that Mr. Martin had

58

some someone shoot rounds into Petitioner's house.[14] (Id.) The undersigned finds that Petitioner fails to demonstrate what the result of calling Mr. Martin as a witness would have revealed, and how it would have altered the outcome of the verdict. See Bassette v. Thompson, 915 F.2d 932, 940 - 41 (4th Cir. 1990)(an allegation that an attorney conducted an inadequate investigation does not warrant relief absent a proffer of the specific favorable evidence the investigation would have brought out). Petitioner merely speculates that calling Mr. Martin as a witness would have convinced the jury of his theory that the victims were killed by the drug cartel.

Second, the undersigned finds that Petitioner was not prejudiced by counsels' failure to call Charlene Spriggs and Verona Spriggs as witnesses. During the omnibus hearing, Petitioner testified that he requested counsel to call Charlene Spriggs and Verona Spriggs as witnesses during his criminal trial. (Document No. 36, Exhibit 13, p. 232.) Petitioner stated that Charlene Spriggs would have testified "[w]hat she had told me while I was in the hospital. She visited me in the hospital, and she told me a lot of what was going on." (Id.) Petitioner stated that Verona Spriggs would have testified that "[s]he called me at the hospital and told me what was going on." (Id.) The undersigned notes that Charlene Spriggs and Verona Spriggs were called as witnesses during Petitioner's omnibus hearing, but failed to offer any evidence that Petitioner was prejudiced by their lack of testimony at trial. During the omnibus hearing, Verona Spriggs merely testified that she was the mother of Chester and Michael Spriggs, and that Chester never stated that he and Michael lied to the police concerning the murder investigation. (Id., p. 20 - 22.) Charlene Spriggs testified that she visited Petitioner at the hospital and Petitioner stated that Chester was mad at him because Petitioner

---

[14]  It is undisputed that he guns allegedly stolen from Petitioner's residence were not used in the victim's murders.

would not lend him a car. (Id., pp. 92 - 97.) Although Charlene and Verona's testimony may have corroborated Petitioner's testimony that Petitioner believed Chester was involved in the murders, the credibility determination remained with the jury. Petitioner has failed to demonstrate that he as prejudiced by counsels' failure to procure Dana Martin, Charlene Spriggs, and Verona Spriggs as witnesses. Accordingly, Petitioner has not met his burden of rebutting by clear and convincing evidence, the presumption of correctness of the State *habeas* court's factual findings, as required by 28 U.S.C. § 2254(e)(1).

### 8.    Trial counsel committed cumulative errors.

Petitioner claims that the cumulative errors of trial counsel resulted in his unconstitutional conviction. (Document No. 1-3, pp. 9 -16.) In Arnold v. Evatt, 113 F.3d 1352 (4th Cir. 1991), the Fourth Circuit Court of Appeals specifically rejected a request to cumulatively review alleged trial court errors. Id. Under the cumulative error analysis, the individual claims of error must first be reviewed on the merits to determine if they are in fact actual errors. See Fisher v. Angelone, 163 F.3d 835 (4th Cir. 1998); United States v. Russell, 34 Fed.Appx. 927 (4th Cir. 2002) (unpublished). As set forth above, the undersigned has determined that Petitioner's ineffective assistance of counsel claims are without merit and, therefore, do not constitute error. Accordingly, the undersigned finds that there is no error to cumulate in this case.

## C.    **Exculpatory Evidence.**

Petitioner contends that the prosecutor violated his due process right to exculpatory evidence under Brady. (Document No. 1-4.) Specifically, Petitioner argues that the "State refused to provide him with including but not limited to the prosecutions investigative reports of this case, notes, statements, scientific experts reports on DNA and ballistics which were introduced at his trial in an

edited version which denied him the right to fully and fairly defend himself against the three indictments of first degree murder." (Id., p. 1.) Petitioner claims that "[l]ying under oath and concealing data that would have revealed the lie, violated Mr. Allen's constitutional right to due process and his constitutional right to conduct an effective cross-examination of Trooper Myers." (Id., p. 8.) Petitioner further contends that he has a "constitutional right to discovery." (Id., p. 3.) Petitioner argues that his right to "discovery is guaranteed unto the defendant under the Rules of Criminal Procedure." (Id., p. 4.) Petitioner states that "the lack of discovery denied him the ability to know the charges and information against him and to establish and develop a defense relating to the aspects and tactics in science and most of all ballistics." (Id.)

In his response, Respondent argues that there is no evidence to support Petitioner's claim of a Brady violation. (Document No. 37, pp. 40 - 41.) Specifically, Respondent states that there was no Brady violation concerning the bullets identified as EV 23 and EV 1 because the evidence was received by defense counsel prior to trial. (Id., p. 40.) Respondent further contends that Petitioner was allowed to challenge Trooper Myers' DNA results and cross-examine Trooper Myers concerning Magistrate Hogg's finding that Trooper Myers had lied under oath in a prior criminal trial. (Id., p. 41.) Respondent claims that "[t]here is no evidence remotely suggesting that Trooper Myers had falsified his findings in this case." (Id.) Therefore, Respondent argues that "[t]he State did not violate Petitioner's rights under Brady.

It is well established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). In United States v. Agurs, 427 U.S. 97,

111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976), the Supreme Court clarified the prosecutor's duty to require disclosure of favorable evidence to the defense, even if not requested. This duty encompasses impeachment evidence, exculpatory evidence, and evidence "known only to police investigators and not to the prosecutor." Kyles v. Whitley, 514 U.S. 419, 438, 115 S.Ct. 1555, 1567-68, 131 L.Ed.2d 490 (1995). However, a prosecutor does not have a "constitutional duty routinely to deliver his entire file to defense counsel." United States v. Agurs, 427 U.S. at 111, 96 S.Ct. at 2401. If the prosecution suppresses Brady material, the disclosure of which would have in all reasonable probability resulted in a different outcome, then the mandates of due process are violated. See United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Brady v. Maryland, 373 U.S. at 87, 83 S.Ct. at 1196-97. To state a valid Brady claim therefore, the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching, [the] evidence must have been suppressed by the State, either willfully or inadvertently," and the evidence must have been material to the verdict such that its suppression prejudiced the defense. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999); Monroe v. Angelone, 323 F.3d 286, 299-300 (4th Cir. 2003). However, "when the claim is one of delayed disclosure rather than complete suppression . . . [the Court] need not reach the question whether the evidence at issue was 'material' under Brady unless the defendant first can show that defense counsel was 'prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case.'" United States v. Lemmerer, 277 F.3d 579, 588 (1st Cir.), cert. denied, 537 U.S. 901, 123 S.Ct. 217, 154 L.Ed.2d 173 (2002)(quoting United States v. Ingraldi, 793 F.2d 408, 411-12 (1st Cir. 1986)).

> The "principal concern" in such cases is "whether the failure to supply the
> information in a seasonable fashion caused the defense to change its trial strategy."

*United States v. Joselyn*, 99 F.3d 1182, 1196 (1st Cir. 1996). Thus, the defendant must show that "learning the information altered the subsequent defense strategy and [that], given timeous disclosure, a more effective strategy would likely have resulted." *United States v. Devin*, 918 F.2d 290 (1st Cir. 1990). He cannot rely on wholly conclusory assertions but must bear the burden of producing, at the very least, a prima facie showing of a plausible strategic option which the delay foreclosed." *Id.*

Lemmerer, 277 F.3d at 588.

### 1.    The bullets identified as EV 23 and EV 1.

After reviewing the transcripts of the criminal trial and omnibus hearing, the undersigned finds that information concerning the bullets identified as EV 23 and the EV 1 were not withheld from Petitioner or trial counsel. (Document No. 36, Exhibit 15, pp. 9 and 44.) Therefore, Petitioner's claim is an issue of delayed disclosure and the Court need not determine whether the evidence was material unless Petitioner first shows that defense counsel was "prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." The relevant inquiry is whether the defendant was able to effectively use the exculpatory or impeaching information. The undersigned finds that Petitioner has failed to demonstrate that the delay in disclosure of the bullets identified as EV 23 and EV 1 impeded his ability to prepare and present his defense. First, the record reveals that counsel was provided with Trooper Lane's bench notes prior to trial, which stated that the bullet identified as EV 23 was fired from Petitioner's Ruger 9mm. (Id., Exhibit 17, pp. 91 and 95.) Additionally, trial counsel was permitted to cross- examine Trooper Lane concerning his failure to include the information regarding the bullet identified as EV 23 in his original report. (Id., p. 95 - 96.) Next, even though the bullet identified as EV 1 was omitted from the evidence sent to defense counsel's experts for independent testing, it is undisputed that the

prosecutor revealed the existence of the EV 1 bullet to defense counsel prior to trial.[15] (Id., Exhibit 15, pp. 274 - 88.) Specifically, trial counsel acknowledged that he was aware that EV 1 bullet had been omitted from the evidence sent to his expert prior to the trial beginning, but as part of his trial strategy he decided to seek the exclusion of the evidence instead of a continuance. (Id., pp. 249 - 51, 274, 322.) The trial court indicated that it would continue the trial in order to allow Petitioner's experts to examine the bullet, but trial counsel stated that "we're going to withdraw the motion because we don't want a continuance of the case." (Id., pp. 249 - 76.) Thus, Petitioner and trial counsel decided to proceed with trial on the strategy of discrediting the State's experts based upon their failure to submit the bullet to Petitioner's expert for independent testing. (Id., Exhibit 13, pp. 113 -14, 154 - 57, 235 - 36, 263 and Exhibit 15, pp. 274 - 88.) The undersigned notes that the trial court thoroughly explained to Petitioner the consequence of withdrawing his motion and proceeding with the trial, and Petitioner acknowledged that he understood. (Id., Exhibit 15, pp. 278 - 88.)

Based on the foregoing, the undersigned finds that counsel clearly had the opportunity to review the reports concerning the EV 23 and EV 1 bullets prior to trial. Any delay in disclosure did not alter Petitioner's defense strategy of focusing the jury's attention on circumstances indicating that Petitioner was framed by the drug cartel. Furthermore, Petitioner was extensively advised by the trial court that a continuance would be granted in order to allow the bullet identified as EV 1 to be tested by Petitioner's independent expert, but Petitioner stated that he wished to proceed with the trial. The undersigned finds that the substance of reports concerning the bullets identified as EV 1 and EV 23 were not such that it determined the guilt or innocence of Petitioner as to prejudice his

---

[15]  Trooper Lane stated that he compared the bullet recovered from Jeanette's body, EV 1, with bullets from his test fire, and he concluded that "the fired bullet from Dr. Kaplin was fired from the Ruger handgun." (*Id.*, Exhibit 17, p. 32.)

defense. The undersigned notes that aside from the bullets identified as EV 1 and EV 23, there were several other bullets and shell casing recovered from the Henderson house that were linked to the Petitioner's Ruger 9mm and Tech-9mm. (Id., Exhibit 17, p. 84.) Additionally, Martha's blood was determined to be inside the barrel of the Tech-9mm. (Id., pp. 163 - 67.) Therefore, Petitioner's claim concerning the bullets identified as EV 23 and EV 1 should be dismissed because he has failed to establish a Brady violation.

### 2.    Judge Hogg's Proposed Finding and Recommendation.

Petitioner additionally claims that he was prevented from using exculpatory evidence to effectively cross examining Trooper Myers concerning the DNA results. The undersigned notes that defense counsel sought the admission of a Proposed Finding and Recommendation written by United States Magistrate Judge Jerry Hogg in an unrelated criminal case where Judge Hogg determined that Trooper Myers had lied under oath. (Document No. 36, Exhibit 17, pp. 100 - 15.) The trial court took judicial notice of Judge Hogg's Proposed Finding and Recommendation, and District Judge John Copenhaver's Memorandum Opinion overruling Judge Hogg's recommendation. (Id., pp. 112 - 14, 192 - 94.) The trial court then allowed trial counsel to cross examine Trooper Myers concerning Judge Hogg's findings that Trooper Myers had lied under oath in a prior, unrelated, criminal trial. (Id., p. 196 - 204.) To state a valid Brady claim, there must be evidence "favorable to the accused, either because it is exculpatory, or because it is impeaching, [the] evidence must have been suppressed by the State, either willfully or inadvertently," and the evidence must have been material to the verdict such that its suppression prejudiced the defense. The undersigned finds no evidence of a Brady violation. The trial court took judicial notice of Judge Hogg's Proposed Finding and Recommendation and allowed trial counsel to cross examine Trooper Myers concerning those

findings. The undersigned notes that there is no evidence suggesting that Trooper Myers falsified his findings concerning DNA testing in Petitioner's criminal trial. Thus, the undersigned finds that Petitioner's claim of a <u>Brady</u> violation concerning the Trooper Myer's DNA results should be dismissed.

**D.      Petitioner's Pretrial Statements.**

Petitioner contends that the "trial court committed reversible error when it did not suppress all post <u>Miranda</u> statements by the petitioner." (Document No. 1-5.) Petitioner alleges that "the police used duress and coercive means to elicit said statements in violation of both his state and federal constitutional rights to remain silent, and his Fifth and Sixth Amendment right to counsel and his Fourteenth Amendment right to the United States Constitution." (<u>Id.</u>, p. 1.) First, Petitioner alleges that his February 16, 1998, statement should have been suppressed because he was questioned for 12 to 14 hours at the West Virginia State Police Detachment and he "wasn't fed or allowed to go to the bathroom and did not have anything to drink and had his shoes taken away." (<u>Id.</u>, p. 2.) Petitioner, however, concedes that he "did not make any incriminating statements" on February 16, 1998. (<u>Id.</u>) Petitioner claims that on February 17, 1998, he "suffered a heart attack due to the duress placed upon him by law enforcement and was hospitalized at the Bluefield Regional Hospital, where he remained from February 17 through February 23, 1998, and then he was transferred to the Veteran's Hospital in Richmond, Virginia, where he stayed from February 24 until February 27, 1998." (<u>Id.</u>) Next, Petitioner argues that his February 25, 1998, statement should have been suppressed because (1) "[o]n February 20, 1998, the State Police swore out a complaint and obtained arrest warrants charging petitioner with the deaths of Jeanette Henderson, David Henderson, and Martha Barber;" and (2) the statement was obtained during Petitioner's

66

hospitalization at the Veteran's Hospital. (Id., p. 3.) Petitioner states that the police "knew he had

been suffering from physical and mental problems and was emotionally unstable." (Id., p. 8.)

Finally, Petitioner contends that his March 2, 1998, statement should have been suppressed because

the officers took Petitioner to the State Police Detachment for processing, where the officers

obtained the statement, prior to taking Petitioner to the McDowell County Magistrate for

arraignment. (Id., p. 3.) During Petitioner's transportation from Richmond, Virginia, to McDowell

County, West Virginia, Petitioner alleges that "[o]ne of the officers told him that he should have

killed niggers besides white people, that Trooper Bishop pointed a gun at him, called him a murder,

and said if he did not give them a confession that he was not going to see the outside world again."

(Id.) Petitioner complains that he did not have "access to counsel during the five (5) hour trip and

the trooper should not have interrogated the petitioner during transportation." (Id., p. 5.) Thus,

Petitioner alleges that "all the alleged statements given before and after he was Mirandized by the

State Police should have been excluded in their entirety by the trial court." (Id., p. 6.)

In response, Respondent argues that the State *habeas* court concluded that Petitioner's

statements were voluntary and the "state court's findings are not contrary to, nor an unreasonable

application of, federal constitutional law." (Document No. 37, pp. 42 - 43.) Respondent further

contends that Petitioner's claim that the State obtained his final confession in violation of the prompt

presentment rule is not cognizable in federal *habeas* proceedings. (Id., p. 43.) Respondent argues

that "[a]lleged violations of state rules of procedure are not cognizable in federal habeas." (Id.) The

State *habeas* court found as follows:

> Pursuant to the trial transcript, Allen's statements to the police were voluntary in
> every occasion because Allen was given his Miranda rights because each line of
> questioning. First, on the morning of February 15, 1998, when Trooper Bishop went
> to Allen's trailer, Allen voluntarily consented to the search and did not ask to talk to

a lawyer or to anyone. Allen then admitted to having a Ruger and told the police that it was behind a water heater. In fact, Allen specifically directed the troopers to the place where the Ruger was hidden, and the troopers, reached out, gained possession of the Ruger and took it to the police station with them. Allen then voluntarily went to the police station with the troopers. At the police station, the troopers informed Allen of his Miranda rights. Trooper Bishop then specifically told Allen that he wanted to question him about the murders. Allen signed a form that said he was not under arrest and could leave at any time. Hence, according to the objective standard outlined in Honaker, "a reasonable person would not have felt that 'compulsive aspect of custodial interrogation.'" Honaker, 193 W. Va. At 61, 454 S.E.2d at 106. Subsequent to being informed of his Miranda rights, Allen then gave two separate statements at the police station: one at 13:38 p.m. and another one at 16:34 p.m. Allen then had an opportunity to review the statements he gave at the police station and make any changes on them. Allen reviewed these statements but declined to make any changes. Further, when the troopers went to Richmond to pick up Allen, they Mirandized him "as soon as we got him." At that time, Allen had already been arrested for the three murders. Allen then waived his Miranda rights and agreed to be interviewed by Troopers Bishop and Cochran. In this case, it appears that Allen's confession were voluntary because he waived his Miranda rights every time he was informed of these rights. The troopers read Allen his Miranda rights every time before interviewing Allen regarding the homicides.

Allen claims, however, that Troopers Bishop and Cochran had threatened him on the way to Welch. Specifically, Allen stated that Trooper Cochran said to him, "You're going to confess one way or the other, you're going to confess to these crimes" and "You ain't going to see the outside world in the morning if you don't confess." While the presence of "coercive policy activity is a necessary predicate" in finding involuntariness in giving a confession, these statements were not conclusively proven by Allen. The West Virginia Supreme Court of Appeals stated that it will not disturb trial court's decisions regarding voluntariness of confessions unless such decisions are clearly wrong and contrary to the available evidence. The trial court found Allen's confessions to be voluntarily and intelligently made while taking the totality of circumstances into consideration. Troopers Bishop, VanMeter and Cochran testified that they read Allen his Miranda rights each time before interviewing him, and Allen waived his Miranda rights every time before giving a statement. Allen did not seek a lawyer, request cessation of questioning or change the substance of his statements when given the opportunity to do so. Hence, there was ample evidence that Allen's confessions were given intelligently and voluntarily.

(Document No. 14, Exhibit 8, pp. 12 - 14.)

The Fifth Amendment prohibits a police officer from coercing a defendant into making an

involuntary or coerced statement. United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997), cert. denied, 522 U.S. 874, 118 S.Ct. 192, 139 L.Ed. 130 (1997). A statement is involuntary, if a defendant's will to resist is overpowered as the result of police conduct such that the defendant could not refuse making the incriminating statement. See Braxton, 112 F.3d at 783; United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987). A confession is not automatically rendered involuntary by "[t]he mere existence of threats, violence, implied promises, improper influence, or other coercive activity." Braxton, 112 F.3d at 780. A coerced confession claim requires that the Court look to the "totality of the circumstances" in determining whether the individual was unduly influenced and whether the confession was voluntary. Pelton, 835 F.2d at 1071. Relevant factors for the Court's consideration include the defendant's age, education, level of intelligence, the duration of questioning, the use of physical coercion or deprivation, the defendant's experience with the criminal justice system, and whether the defendant has been advised of his Miranda rights. See United States v. Abu Ali, 528 F.3d 210, 232 (4th Cir. 2008); Correll v. Thompson, 63 F.3d 1279, 1288 (4th Cir. 1995).

The United States Supreme Court further recognizes that a delay in presenting an arrestee to a magistrate judge for arraignment can preclude the admission of a confession obtained during the delay. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed. 1479 (1957); McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). Although a "delay in promptly presenting the accused to a magistrate is a significant factor bearing on the voluntariness issue," such a delay does not absolutely preclude admission of testimonial evidence of a defendant's confession where a delay is relatively short in duration. United States v. Dodier, 630 F.2d 232, 236 (4th Cir. 1980).

The undersigned finds that Petitioner's above claims are without merit because there is no evidence that the State *habeas* court's determination was contrary to a reasonable application of federal law, or based on an unreasonable determination of facts. The undersigned has reviewed the transcripts of Petitioner's statements and finds that Petitioner clearly understood the circumstances under which he was questioned and he was clearly advised of his <u>Miranda</u> rights prior to all questioning by the police officers. The undersigned finds that the delay in taking Petitioner before the magistrate judge was not unreasonable and that Petitioner's statements were made knowingly and voluntarily.[16] Further, there is no evidence that Petitioner ever requested counsel or told officers

---

[16]During the Motion to Suppress hearing, the trial court found as follows concerning the issue of prompt presentment:

> As to the issue of proper and timely presentment of the defendant before the magistrate, the testimony elicited is that the police officers would have left Richmond shortly after noon on March the 2nd and arrived here in Welch at around 5:15 or 5:20 that afternoon, or that evening.

> The Court can take judicial notice that his driving time from Richmond to Welch because the Court has driven, only I was a little slower than the police officers were. Normally it takes me six hours to drive from Richmond to Welch, but, notwithstanding, they did it in basically five and a half hours and that's all right. The police are obligated to make a timely presentment of the defendant before a magistrate, but if the defendant voluntarily agrees to give a statement, the police officers can't just turn a deaf ear and say, no, we won't take this statement at this time; we're just going to take you to the magistrate. That is just no good police work, so the evidence in this case is that the defendant made certain oral statements en route from Richmond to Welch and when the police officers got the defendant to Welch, they asked him whether or not he wanted to reduce it to writing or would he agree to reducing it to writing, which he said, yes. And they went on and took the statement. There is no unreasonable delay in taking a defendant before the magistrate from one hour, the Court does not perceive to be an unreasonable delay, notwithstanding that there was travel time of approximately five hours or five and a half hours to get him here. So there is really no real basis that the Court is persuaded by as to threats and force or coercion into make this defendant do anything. So the Court finds that the statements were voluntary, the State met its burden of proof and that these statements will be admissible.

that he wished to stop questioning. See McNeil v. Wisconsin, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)(to properly assert a right to consult with an attorney during custodial interrogation, an individual must, "at a minimum, [make] some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney"). Thus, the record does not reveal any issue of constitutional magnitude in the trial court's admission of Petitioner's statements. Based upon the foregoing, the undersigned finds that Petitioner has not met his burden of rebutting by clear and convincing evidence, the presumption of correctness of the State *habeas* court's factual findings, as required by 28 U.S.C. § 2254(e)(1).

**E.    Prosecutorial Misconduct.**

With respect to claims of prosecutorial misconduct, federal *habeas* review is available only upon a showing that the prosecutor's remarks were improper and that the remarks "prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993)(internal citations omitted). The test is whether the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471-72, 91 L.Ed.2d 144 (1986)(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871-72, 40 L.Ed.2d 431 (1974).). The fact that the comments are "undesirable or even universally condemned" is insufficient to establish a due process violation. Id. In determining whether the prosecutor's comments denied the defendant of a fundamentally fair trial, the Court should consider the following factors: "(1) the nature of the comments, (2) the nature and quantum of the evidence before the jury, (3) the arguments of opposing counsel, (4) the judge's charge, and (5) whether the

_____

(Document No. 36, Exhibit 22, pp. 22 - 24.)

errors were isolated or repeated." <u>Arnold v. Evatt</u>, 113 F.3d 1352, 1358 (4th Cir. 1997), <u>cert. denied</u> <u>sub nom.</u>, <u>Arnold v. Moore</u>, 522 U.S. 1058, 118 S.Ct. 715, 139 L.Ed.2d 655 (1998); <u>see also</u> <u>United</u> <u>States v. Harrison</u>, 716 F.2d 1050, 1052 (4th Cir. 1983), <u>cert. denied sub nom.Wissler v. United</u> <u>States</u>, 466 U.S. 972, 104 S.Ct. 2345, 80 L.Ed.2d 819 (1984). The Court must not review the prosecutor's comments in isolation. Rather, the remarks must be reviewed in context of the entire proceedings to determine whether the comments violated the defendant's right to a fundamentally fair trial. <u>See</u> <u>Mitchell</u>, 1 F.3d at 240; <u>United States v. Young</u>, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985)("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.").

      **1.**      **Improper Closing Statement:**

Petitioner states that the prosecutor violated the "Golden Rule Argument" when urging jurors "to place themselves or members of their families or friends in the place of the person who has been offended and to render a verdict as if they or either of them or members of their families or friend was similarly situated." (Document No. 1-7, p. 2.) Petitioner asserts that the prosecutor "violated the 'Golden Rule Argument' when the prosecutor used the first person ('I believe' "I think') in his discussion of the credibility of the varying accounts given by the witnesses about the petitioner's alleged actions." (<u>Id.</u>, p. 5.) Therefore, Petitioner claims that the "prosecutor injected his personal opinion as to the guilt of the petitioner, asserted his belief in the honest, sincerity, truthfulness, and good motive of his witnesses, while attacking the honesty and veracity of the petitioner's witnesses." (<u>Id.</u>, p. 7.)

The undersigned has reviewed the trial transcript and finds nothing improper about the prosecutor's closing argument. First, the undersigned finds that the prosecutor did not violate the "Golden Rule" by urging jurors to put themselves in a particular party's place. At the end of the prosecutor's closing argument, he stated as follows:

> And I ask you on behalf of the State of West Virginia, - - when you deliberate and return your verdicts, on behalf of the State of West Virginia, based on the evidence which proves beyond any reasonable doubt that he committed these crimes, and more importantly, on behalf of these victims families, Mrs. Barber's sons and their wives, Judy McDaniel. They're here to see justice done. And the only way they can begin to recover from the pain of this, is to see him convicted for what he did. Thank you.

(Exhibit 18, p. 258.) In the above statement, the prosecutor merely requested that the jury return a verdict in favor of the State and the victims' families. The prosecutor never requested the jury to put themselves in the place of the victims or the victim's families.

The undersigned further finds that the prosecutor did not improperly vouch for the credibility of the witnesses. Improperly vouching occurs when a prosecutor either (1) bluntly states a personal belief in a witness's credibility that places the prestige of the prosecutor's office behind that witness, or (2) implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury. See United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); United State v. Francis, 170 F.3d 546, 550 - 51 (6th Cir. 1999); United States v. Lewis, 10 F.3d 1086, 1089 (4th Cir. 1993). Absent such personal vouching, a prosecutor may fairly comment on the evidence. See United States v. Perez, 144 F.3d 204, 210 (2nd Cir. 1998)(approving use of "I submit" to urge the jury to reach certain conclusion without impermissibly interjecting the prosecutor's personal beliefs into the case); United States v. Catalfo, 64 F.3d 1070, 1080 (7th Cir. 1995), cert. denied, 517 U.S. 1192, 116 S.Ct. 1683, 134 L.Ed.2d 784 (1996)(prosecutor permitted to argue that jury should believe one witness over another); and United States v. Goodapple, 958 F.2d 1402, 1409

73

- 10 (7th Cir. 1992)(prosecutor may refer to a witness as a "lair" as long as the comment "reflect reasonable inference from the evidence adduced at trial rather than personal opinion"). In the underlying criminal trial, the prosecutor merely pointed to inconsistency in the testimony. See United States v. Moore, 710 F.2d 157, 159 (4th Cir. 1983), cert. denied, 464 U.S. 862, 104 S.Ct. 192, 78 L.Ed.2d 169 (1983)(stating "[it] was of course permissible, indeed it was good trial advocacy, for the government to stress to the jury the inconsistencies and improbabilities in [the witness's] testimony"). Specifically, the prosecutor emphasized that Petitioner's version of the circumstances surrounding the shooting were contradictory to the majority of the evidence.[17] The undersigned found three instances where the prosecutor stated "I suggest," "I think," and "I submit" in his closing arguments. First, the prosecutor stated as follows:

> Now I want to suggest to you, ladies and gentlemen, based on the evidence collected in this case and tested and analyzed in this case and presented to you, this is not a close case. The evidence of his guilt, the evidence of Stanford Tony Allen, Jr., committed these murders, is over whelming. It's beyond any reasonable doubt whatsoever. And we're going to address this now in our closing argument.

(Document No. 36, Exhibit 18, p. 242.) Second, the prosecutor argued as follows:

> And I think Trooper Cochran said it in this testimony, why would anyone - - why would someone go in the bathroom and brutally murder a 75 year old woman who actually was in there on the commode? I'm sure terrified, that someone went in there and shot her repeatedly, put the gun right against her.

---

[17] The undersigned found two instances where the prosecutor "I think" and "I submit" in his closing arguments. First, the prosecutor stated as follows:

> And I think Trooper Cochran said it in this testimony, why would anyone - - why would someone go in the bathroom and brutally murder a 75 year old woman who actually was in there on the commode? I'm sure terrified, that someone went in there and shot her repeatedly, put the gun right against her.

(Document No. 36, Exhibit 18, p. 280.) Next, the prosecutor argued that "I suggest to you that the evidence shows that she was terrified trying to get away." (Id., p. 86.)

74

(Id., p. 280.) Third, the prosecutor stated that "I suggest to you that the evidence shows that she was terrified trying to get away." (Id., p. 86.) Clearly, the prosecutor was not indicating that he had personal knowledge, but was referring to the evidence presented at trial. The Court has reviewed the prosecutor's comments in context of the entire proceedings and finds that the comments did not violate Petitioner's right to a fundamentally fair trial. Although the prosecutor's comment that "I'm sure terrified, that someone went in there and shot her repeatedly, put the gun right against her" may have been "ill-advised," a due process violation does not result from comments that are merely "undesirable or even universally condemned." Darden, 477 U.S. at 181, 106 S.Ct. at 2471-72. Further, the above comment was isolated, and not repeated. The undersigned cannot find that the remarks violated the integrity of Petitioner's criminal proceedings or denied Petitioner due process. The undersigned further notes that the jury was instructed that the comments of the lawyers were not evidence and were not to be considered as matters of fact, and jurors are presumed to follow the court's instructions. Moreover, in light of the evidence against Petitioner, Petitioner fails to establish that these comments were so prejudicial as to deprive them of a fair trial. Accordingly, Petitioner's above claim of prosecutorial misconduct should be dismissed.

**2. Prosecutor did not refer to Petitioner as a "murderer."**

Petitioner alleges that the prosecutor "during the opening moment of his closing argument, made an improper and prejudicial statement in referring to the petitioner as a murderer (Tr. Pg. 242), when in fact the petitioner, has not been found guilty by the jury of the crime of murder." (Document No. 1-7, p. 2.) In response, Respondent argues that during opening statements, the prosecutor merely "told the jury that the evidence would establish that the Petitioner had murdered all three victims." (Document No. 37, p. 46.) Respondent states that "[s]uch a statement did not constitute prosecutorial

misconduct [because] [i]t is merely a comment on what the State intended to prove." (Id.)

The undersigned finds no evidence that the prosecutor improperly referred to Petitioner as a murderer during opening or closing statements. (Document No. 36, Exhibit 13, pp. 127 - 39, and Exhibit 18, pp. 242 - 57.) During opening statements, the prosecutor stated as follows:

> The medical examiner will describe to you the types of wounds that she suffered and how close the murderer was to her. But all three of [the victims] were murdered there in the early morning hours of February 14th and the evidence will prove to you beyond a reasonable doubt that the person who murdered them was Stanford Allen - - Stanford Tony Allen, Jr. He is the person who committed these crimes.

(Id., Exhibit 13, p. 130.) The trial court instructed the jury that the purpose of opening statements is for counsel to "tell us what they believe the evidence will show. The opening statements are neither arguments nor evidence and should not be considered as such." (Id., Exhibit 14, p. 126.) During closing arguments, the prosecutor argued as follows:

> Ladies and gentlemen, this is a day that the families of these three victims, in this case, David Henderson, Jeanette Henderson and Martha Barber, have waited 19 months for. This is the day they are here hoping that through you, through your verdict, based on the evidence in this case, this murderer will face justice. That he'll face the consequences of what he did on February 14, 1998.
>
> Now I want to suggest to you, ladies and gentlemen, based on the evidence collected in this case and tested and analyzed in this case and presented to you, this is not a close case. The evidence of his guilt, the evidence of Stanford Tony Allen, Jr., committed these murders, is over whelming. It's beyond any reasonable doubt whatsoever. And we're going to address this now in our closing argument.

(Id., Exhibit 18, p. 242.) The prosecutor merely argued that the evidence presented at trial proved that Petitioner murdered the victims. United States v. Francisco, 35 F.3d 116, 120 (4th Cir. 1994)(stating that "closing argument is not merely a time for recitation of uncontroverted facts, but rather the prosecution may make fair inferences from the evidence"). The undersigned cannot find that the remarks violated the integrity of Petitioner's criminal proceedings or denied Petitioner due

process. The undersigned further notes that the jury was instructed that the comments of the lawyers were not evidence and were not to be considered as matters of fact, and jurors are presumed to follow the court's instructions. Accordingly, Petitioner's above claim of prosecutorial misconduct should be dismissed.

### 3.    Prosecutor did not present perjured or false testimony.

Petitioner states that the prosecutor engaged in misconduct by "presenting perjured and false testimony. (Document No. 1-7, p. 3.) Specifically, Petitioner contends that the prosecutor offered false testimony from the following witnesses: Mark Dean, Chester Spriggs, Michael Spriggs, Howard Myers, and C.R. Lane. (Id., p. 3.) Petitioner alleges that the prosecutor knowingly allowed Chester and Michael Spriggs "falsely testify about everything he said, he specifically lied about seeing petitioner with a 9mm pistol in holster strap." (Document No. 39-4, p. 24.) Petitioner states that Chester testified falsely because Petitioner never stated that he "wacked some people on Powerhouse Hill." (Id., p. 26.) Petitioner alleges that the prosecutor allowed Trooper Myers and Trooper Lane "to testify false about their test results at petitioner's trial." (Id., p. 24)

During Petitioner's underlying criminal trial, Mark Dean, Chester Spriggs, and Michael Spriggs testified that Petitioner visited Chester's residence at approximately 4:00 a.m., on February 14, 1998, because Petitioner wanted to borrow money to purchase drugs. (Document No. 36, Exhibit 16, pp. 126- 70.) Chester stated that Petitioner returned to the residence a second time on the morning of February 14, 1998, and stated that "he had just wacked some people." (Id., p. 168.) Mark, Chester, and Michael testified that Petitioner returned to the residence a third time around noon on February 14, 1998, with a case of beer and his 9mm gun in holster. (Id., p. 130, 146 - 47, and 170.) Petitioner testified that he never visited the residence of Chester Spriggs on February 14,

1998, and that he was being set up for the murders. (Id., Exhibit 18, pp. 113, 145 - 46.) Specifically, Petitioner explained that his house had been broken into several times by Chester Spriggs, Mark Dean, and Alexander Jink Anthony, and three of his guns had been stolen. (Id., p. 110 - 11.) Petitioner further asserts that Trooper Lane and Trooper Myers gave perjured testimony concerning their test results. (Document No. 1-7, p. 4.) The undersigned notes, however, that both Trooper Lane and Trooper Myers were extensively cross-examined by defense counsel concerning their collection and testing of evidence.

In view of the foregoing, the undersigned finds that there is no evidence that prosecutor presented false or perjured testimony. A prosecutor's use of testimony that he knows, or should have known, to be false or perjured to obtain a conviction violates due process. See United States v. Bagley, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); United State v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed. 342 (1976). The mere existence of discrepancies or inconsistencies in testimony, however, does not establish that the prosecutor knowingly used false or perjured testimony. See United States v. Griley, 814 F.2d 967, 971 (4th Cir. 1987)(finding that "[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony"). In the instant case, Petitioner merely indicates that testimony by the State witnesses conflicted with the testimony of defense witnesses. The undersigned notes that any inconsistencies in witness testimony goes to the credibility of that witness. The undersigned further finds that Petitioner failed to present any evidence during his State *habeas* proceedings that would indicate that false testimony was presented by the prosecutor. Thus, Petitioner's conclusory allegation that the prosecutor engaged in misconduct by offering false testimony is without merit and should be dismissed.

## PROPOSAL AND RECOMMENDATION

Accordingly, the undersigned hereby respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT** Respondent's Consolidated Response, Motion to Dismiss, and Motion for Summary Judgment (Document No. 36.), **DENY** Petitioner's Motions to Grant Petition for Writ of *Habeas Corpus* (Document Nos. 41 and 44.), and **DISMISS** Petitioner's Petition (Document No. 1.) and remove this matter from the Court's docket.

The parties are hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge David A. Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have thirteen days (ten days, filing of objections and three days, mailing/service) from the date of filing of this Proposed Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.) *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this "Proposed Findings and Recommendation" and to mail a copy of the same to counsel of record and to Petitioner.

Date: February 20, 2009.

R. Clarke VanDervort
United States Magistrate Judge